BARBARA L. UZZILLIA, Doing Business as Barbara Lucille Nursing Home, et al., Petitioners, v COMMISSIONER OF HEALTH OF THE STATE OF NEW YORK, Respondent.

Second Department, May 5, 1975

*Harvey Stuart (Jonathan Zavin* of counsel), for petitioners.

*Louis J. Lefkowitz, Attorney-General (Robert S. Hammer* and *Samuel A. Hirshowitz* of counsel), for respondent.

*Per Curiam.* The petitioners separately own six private proprietary nursing homes. The respondent Commissioner of Health of the State of New York, after a consolidated hearing, revoked the petitioners' operating certificates for their establishments. The petitioners then instituted this proceeding pursuant to CPLR article 78 to review the commissioner's action.

The petitioners have been operating their establishments for periods ranging from 12 to 40 years. The basis for the revocations was that in January, 1975 a State Health Department inspection team was turned away from each of the nursing homes (on advice of counsel). Prior to those incidents each home had been inspected periodically.

Generally, inspections to determine the homes' qualifications under the Medicaid program had been made once a year and inspections to determine compliance with article 28 of the Public Health Law were made once every two years. A survey normally takes a day for each nursing home. Inspections were usually announced in advance, but on occasion some homes received unannounced examinations by department inspectors. At the consolidated hearing, various administrators of the homes testified (without contradiction) that prior to the incidents in question they had never refused a department inspector admittance, with perhaps one exception. (The one exception was an incident in 1970 when, for a brief period, while court proceedings were pending, the Kruger Nursing Home turned away inspectors. Shortly thereafter the inspectors were admitted.)

By written notices dated December 13, 1974 the commissioner advised each petitioner that hearings would be held (at various times from February 26, 1975 to March 19, 1975): "relative to charges that you have violated provisions of Article 28 of the Public Health Law of the State of New York and of the Rules and Regulations promulgated thereunder, including, but not limited to, Parts 702, 711, 713, 730 and 731 of Chapter V of the State Hospital Code, Title 10 of the Official Compilation of the Codes, Rules and Regulations of the State of New York, to be set forth with more particularly *[sic]* in a statement which will be mailed to you by registered mail at least twenty-one days before the date hereinabove set forth as the date of the hearing * * * and at the conclusion * * *

[of the hearings] a determination will be made with respect to what type of action should be taken by the Commissioner of Health with respect to whether or not the operating certificate heretofore granted * * * should be revoked, suspended, limited or annulled."

Article 28 of the Public Health Law and the above-charged parts of the State Hospital Code are "umbrella" provisions which, when taken together, embrace a large number of statutes and regulations. Thus, the December 13, 1974 notices of hearing did not advise the petitioners of just which requirements of law were allegedly violated. Moreover, the notices contained no factual specifications and therefore did not tell the petitioners just what alleged conduct or nonconduct on their part violated the statutes or regulations.

Thus, among the findings of fact made by the hearing officer and adopted by the State Commissioner were the following: "The aforesaid Notices of Hearing [dated December 13, 1974] did not have Statements of Charges annexed, but did contain a notice that Statements particularizing the alleged violations of Article 28, would be mailed to * * * [the petitioners herein] by registered mail at least 21 days before the date scheduled for the hearings" (bracketed matter supplied).

However, it was established at the hearing that the petitioners never did receive such "Statements of Charges" or any other specifications of the December 13, 1974 notices.

In early January of 1975 the petitioners were informed by telephone and letter, by the commissioner's agents, that a survey team of department inspectors would make a visit on a given date in January of 1975, viz., "to determine compliance with the New York State Hospital Code".

On January 3, 1975, counsel to the petitioners addressed a mailgram to the commissioner's Regional Health Director for Westchester County, stating: "Your Department has served notices of hearing attacking the operating certificates of several nursing homes in Westchester County which are represented by us as attorneys. These notices of hearing have not been accompanied by statements of charges. You have now notified some of these same homes of your intention to send in special teams of inspectors, obviously in an effort to generate charges to back up the notices of hearing. We have advised each of our clients to decline to permit any such extraordinary inspections until the conclusion of the hearing for which the home has been noticed. Our clients in this regard include

the Barbara Lucille, Dean Manor * * * Furman, Kruger, * * * Miramichi and Waldean nursing homes. In the past the Health Department has on some occasions sought ex parte orders from the courts to force the admission of the Department's inspectors into nursing homes. We hereby request that if any such orders permitting entry are to be sought, such application be made upon at least telephoned notice in advance to the undersigned." The respondent did not reply to this or contact the petitioners' counsel with regard to its contents.

On the preannounced inspection dates of January 7 and 10, 1975 department survey teams successively visited the Barbara Lucille Nursing Home and the Kruger Nursing Home. At each facility the owner or administrator refused to admit the inspectors, stating that the refusal was on advice of counsel. In each instance the team then departed, without having inspected the facility. However, on January 10, after being turned away from the Kruger Nursing Home, the team, on instructions from the respondent's regional office, successively visited the Furman, Waldean and Dean Manor homes, and on January 14 proceeded to the Miramichi Nursing Home. The latter four facilities had been scheduled for inspections later in the month. The team's "accelerated" visits met with the same result: the owner or administrator refused to allow inspection, on advice of counsel, and the inspection team withdrew.

Within a few days following each of these attempted inspections, each of the petitioners received a second notice of hearing to revoke, suspend, limit or annul their operating certificates, this time on the basis of the charge that the proprietors had "wilfully opposed and obstructed" the department's inspectors in the performance of their duties, in violation of subdivision 1 of section 2803 of the Public Health Law.

No further attempt to inspect any of these homes was thereafter made by the department and upon the second notices of hearing, the hearing was held on January 31, 1975. Thereafter the hearing officer rendered his report, dated March 12, 1975. It concludes that "the above-named * * * [the petitioners herein] have violated the provisions of Section 2803(1) of the Public Health Law of the State of New York, in refusing to admit the duly authorized representatives of the Department to conduct a survey of * * * [the petitioners'] facilities". It then adds, under "Recommendations", that "the

findings and conclusions above stated are sufficient justification for the Commissioner, in his discretion, to either fine[1] * * * [the petitioners] appropriate penalties and/or revoke the subject licenses. Because of the unique circumstances involved in this particular matter, the Hearing Officer believes that the final determination should be solely that of the Commissioner" (bracketed matter supplied).

By the determinations under review, dated March 26, 1975, the commissioner adopted the findings and conclusions of the hearing officer and revoked the petitioners' operating certificates, effective May 12, 1975 as to the Waldean and Dean Manor homes and April 30, 1975 as to the other four homes. The determinations have been stayed pending this proceeding.

### I. THE VIOLATION.

We are in full accord with the commissioner's conclusion that the petitioners violated subdivision 1 of section 2803 of the Public Health Law. The following statutes contained in article 28 of the Public Health Law are directly pertinent:

"§ 2803. Commissioner and Council; powers and duties.

"1. The commissioner shall have the power to inquire into the operation of hospitals and home health agencies and to conduct periodic inspections of facilities with respect to the fitness and adequacy of the premises, equipment, personnel, rules and by-laws, standards of medical care, hospital service, including health-related services, home health service, system of accounts, records, and the adequacy of financial resources and sources of future revenues."[2]

"§ 2806. Hospital operating certificates; suspension or revocation.

"1. A hospital[3] operating certificate may be revoked, suspended, limited or annulled by the commissioner on proof that: (a) the hospital has failed to comply with the provisions of this article or rules and regulations promulgated thereunder".

---

1. Section 12 of the Public Health Law authorizes imposition of a fine of up to $1,000 for each violation.

2. Further, subdivision 2 of section 206 of the Public Health Law provides: "The commissioner and any person authorized by him so to do, may, without fee or hindrance, enter, examine and survey all grounds, erections, vehicles, structures, apartments, buildings and places."

3. In article 28 "hospital" includes "nursing home" (Public Health Law, § 2801, subd 1).

Nursing home patients generally are elderly, infirm or disabled and no longer under the immediate care and supervision of their loved ones. The people of this State have placed upon their Commissioner of Health the awesome burden of insuring that elderly and infirm persons entrusted to nursing homes are given the care and protection required by the health laws of this State. Inherent in the condition and institutional isolation of the patients is the necessity that the nursing homes always be open to Health Department inspections designed and planned to insure that the care and protection mandated by law are actually being furnished. Thus, nursing homes may not insist that inspections be a matter of appointment or that inspection await the clearance of nursing home counsel or that inspection be delayed pending completion of administrative hearings. Inspections may not be annual or biannual pageants, but should be designed to ascertain fully and realistically the nature and quality of the day-by-day care and protection being afforded the patient.

The hearing officer's report and the petitioners' brief in this proceeding indicate that nursing home counsel relied in part on the decision of the Supreme Court of the United States in *Camara v Municipal Ct.* (387 US 523) and its companion case *(See v City of Seattle,* 387 US 541). In *Camara* the court held that the Fourth Amendment of the Federal Constitution bars prosecution of a person who has refused to permit a warrantless housing-code-enforcement inspection of his personal residence. In *See* the court applied the *Camara* principle to a municipal fire department inspection of private commercial premises.

At bar, however, the nursing homes are not private premises, but are licensed by the State and house elderly and infirm human beings. Thus, the State Health Department teams clearly had the right to inspect (see *United States v Biswell,* 406 US 311 [as to a licensed gun dealer]; *People v Terraciano,* 39 AD2d 1005 [3d Dept, 1972; as to a licensed pharmacist]; and its connected case, *United States ex rel. Terraciano v Montanye,* 493 F2d 682 [2d Cir, 1974], cert den *sub nom. Terraciano v Smith* 419 US 875).

Finally, we note that in *Wyman v James* (400 US 309) the Supreme Court held that the home visitation program provided by New York law in connection with New York's Aid to Families with Dependent Children program is a reasonable administrative tool and does not violate any right guaranteed

by the Fourth and Fourteenth Amendments. The court stated (pp 318–319):

"There are a number of factors that compel us to conclude that the home visit proposed for Mrs. James is not unreasonable:

"1. The public's interest in this particular segment of the area of assistance to the unfortunate is protection and aid for the dependent child whose family requires such aid for that child. The focus is on the *child* and, further, it is on the child who is *dependent.* There is no more worthy object of the public's concern. The dependent child's needs are paramount, and only with hesitancy would we relegate those needs, in the scale of comparative values, to a position secondary to what the mother claims as her rights.

"2. The agency, with tax funds provided from federal as well as from state sources, is fulfilling a public trust. The State, working through its qualified welfare agency, has appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of that tax-produced assistance are the ones who benefit from the aid it dispenses."

We add that in addition to our children there is no more worthy concern than the care of our elderly and infirm, particularly when they are no longer under the immediate care and supervision of their loved ones. Thus, the commissioner's conclusion that the petitioners had violated subdivision 1 of section 2803 of the Public Health Law was fully supported by substantial evidence, eminently correct and must be confirmed.

## II. THE PENALTY

The petitioner nursing homes have been licensed and operating for long periods of time. Statistics furnished at the hearing showed the following:

| Nursing Home | Length of Petitioners' Operations | Average Patient's Age | Average Length of Stays |
|---|---|---|---|
| 1. Barbara Lucille | Since 1960 | 72 + | 2 years + |
| 2. Dean Manor | 30 years | 81.56 | 2 years, 5 months |
| 3. Furman | 32 years | 78.6 | 2 years + |
| 4. Kruger Nursing Home | 40 years | 79.2 | 4 years + . |
| 5. Miramichi | Since 1962 | — — — | — — — |
| 6. Waldean | 30 years | 83.45 | 3 years, 6 months |

The length of time the petitioners have been operating these homes would appear to bespeak a certain amount of

confidence in them by the patients, their families and State officials. However, standards of care are rising and no nursing home has a guarantee that length of operation will shield it from revocation of its license for grave violations of law. Yet, at bar, it was not for any alleged failure to provide adequate proper patient care or for structural deficiencies that the petitioners' operating certificates were revoked.

The hearing officer received in evidence the deposition of an expert who testified on the subject of "transfer shock". The thrust of this testimony was that inevitably, upon relocation from the petitioners' homes, a substantial portion of the patient populations would suffer increased and accelerated onset of mortality, morbidity and psychological and/or behavioral deterioration, stemming from the fact of their transfer to other facilities.

The hearing officer's report dismissed this argument, with the following comment: "[the petitioners] suggest that the fact that a patient may be subjected to 'transfer shock', this should permit a nursing home to continue an operation that is in violation of the applicable provisions of the law. If this line of reasoning is adhered to, we would be forced to make the patently untenable conclusion that no nursing home should ever be closed, regardless of the reasons."

We are in accord, and add that the commissioner, by virtue of the very nature of his office and his qualifications, presumably is aware of this problem and, to the extent consistent with other more immediate and overriding interests to be protected, will make allowance for "transfer shock". One method, of course, is providing the patients with reasonable notice when closing down a home in which the patients have long resided. What constitutes sufficient notice to the patients is a matter best left to the commissioner.

On the argument of this proceeding and in the brief submitted by the commissioner, no decision was cited where any nursing home or health related facility in this State had its license revoked solely for failure to admit a health inspector. Thus, the matter appears to be one of first impression, particularly under the circumstances which the hearing officer described as "unique". The circumstances which we find significant and unique are that each home had long been in operation and (with the one minor exception heretofore noted) had never previously barred a health inspector; the commissioner served the petitioners with what was tantamount to

blank charges and he never did furnish any specifications thereof; the hearings on those "open" charges were pending at the time of the subject thwarted inspections; the petitioners acted on advice of counsel (prior to the decision of the Court of Appeals in *Matter of Butterly & Green v Lomenzo* (36 NY2d 250), which clearly rejected mere reliance on advice of counsel as an excuse); and there did not appear to be any decision, precedent or clear notice to the petitioners that their refusal to admit the inspectors would, under the circumstances at bar, cause revocation of their operating certificates and closure of their nursing homes.

For these reasons we conclude that the punishment imposed on the petitioners was "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness" (see *Matter of Butterly & Green v Lomenzo, supra,* p 256; *Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale and Mamaroneck,* 34 NY2d 222). *Only* because of the unique circumstances of this case, the penalty imposed was an abuse of discretion (CPLR 7803, subd 3) and should be modified to a fine of $500 on each nursing home (cf. *Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale and Mamaroneck, supra; Matter of Butterly & Green v Lomenzo, supra).*

However, by this decision the nursing home industry is now placed on clear and unequivocal notice that we consider refusal to admit governmental health inspectors to be a serious violation of the Public Health Law.

We have considered the other contentions of the petitioners and find them without merit.

GULOTTA, P. J., RABIN, HOPKINS, MARTUSCELLO and LATHAM, JJ., concur.

Each of six determinations of respondent, all dated March 26, 1975, modified, on the law, by reducing the penalty imposed therein to a fine of $500 (on each nursing home). As so modified, orders confirmed, without costs.