[Crim. No. 33892. Second Dist., Div. Five. May 1, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CLARENCE FIRSTENBERG, Defendant and Appellant.

Donald R. Wager and Paul Arthur Turner for Defendant and Appellant.

Burt Pines, City Attorney, and Jack L. Brown, Deputy City Attorney, for Plaintiff and Respondent.

George Deukmejian, Attorney General, James E. Ryan and Donald A. Robinson, Deputy Attorneys General, John K. Van de Kamp, District Attorney, Donald J. Kaplan, Edward G. Feldman and Roderick W. Leonard, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**ASHBY, J.**—This matter is before us on transfer from the Appellate Department of the Los Angeles County Superior Court, pursuant to rule 62(a) of the California Rules of Court. We ordered transfer to consider the constitutionality of a warrantless health department inspection of the business records of a licensed nursing home.

Appellant was the licensee of Lincoln Care Center (Lincoln), a skilled nursing facility within the meaning of Health and Safety Code, section 1250. He was convicted, following a jury trial, of violating Health and Safety Code, section 1290[1] by commingling patients' funds with his own which, in turn, is a violation of title 22, California Administrative Code,

---

[1]Health and Safety Code, section 1290, provides: "Any person who violates any of the provisions of this chapter or who willfully or repeatedly violates any rule or regulation promulgated under this chapter is guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed five hundred dollars ($500) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment."

section 72557.[2] On December 24, 1976, appellant was sentenced to serve 90 days in county jail and to pay a $500 fine. He initially posted bail on appeal, but on December 16, 1977, bail was exonerated and he was released on his own recognizance. The matter has meanwhile wended its way through an appeal in the Appellate Department of the Los Angeles County Superior Court and a rehearing in that court following the decision of the United States Supreme Court in *Marshall* v. *Barlow's, Inc.*, 436 U.S. 307 [56 L.Ed.2d 305, 98 S.Ct. 1816] before being transferred here.

The facts of the case are quite simple. The evidence regarding the inspection was as follows: Frank Batchkoff, a surveyor for the Los Angeles County Department of Health Services, had responsibility for inspecting health facilities for the State of California. (Health & Saf. Code, § 1257.) During February 1976 he visited Lincoln to verify compliance with Health and Safety Code regulations. While reviewing Lincoln's records, he discovered that a check for $4,000 had been drawn on the patients' trust account and deposited in the payroll account of an entity denominated Diversified Company. A second check had been drawn on the patients' trust account in the amount of $15,000 and deposited in the Lincoln payroll account. The administrator of the facility permitted Batchkoff to make copies of the two checks. Based upon this information a warrant was obtained and a further search was conducted. Appellant made an unsuccessful motion to suppress on the ground that Batchkoff's initial inspection was made without a warrant and that it could not be validated by the consent of the Lincoln administrator because section 1431 of the Health and Safety Code, by making the refusal to permit inspection a criminal offense,[3] precludes any consent from being voluntary.

---

[2] Title 22, California Administrative Code, section 72557, provides, in pertinent part:
"Safeguards for Patients' Monies and Valuables. (a) Each facility to whom a patient's money or valuables have been entrusted shall comply with the following:
"(1) No licensee shall use patients' monies or valuables as his own or mingle them with his own. Patients' monies and valuables shall be separated and intact and free from any liability that the licensee incurs in the use of his own or the institution's funds and valuables. . . ."

[3] Health and Safety Code, section 1431, provides:
"It is a misdemeanor for any person to do any of the following:
"(a) Willfully prevent, interfere with, or attempt to impede in any way the work of any duly authorized representative of the state department in the lawful enforcement of any provision of this chapter.
"(b) Willfully prevent or attempt to prevent any such representative from examining any relevant books or records in the conduct of his official duties under this chapter.
"(c) Willfully prevent or interfere with any such representative in the preserving of evidence of any violation of any of the provisions of this chapter or of the rules and regulations promulgated under this chapter."

At trial, the following evidence was adduced: Ernest Delphin, Lincoln's bookkeeper, testified that on August 5, 1975, he told appellant that there were insufficient funds in the Lincoln payroll account to meet the payroll. Appellant told Delphin to transfer funds from the patients' trust account to the payroll account. Delphin at first prepared a single check for $19,000, but appellant directed him to prepare two separate checks, one for $15,000 payable to the Lincoln payroll account and one for $4,000 payable to the Diversified Company payroll account. The Diversified Company account was used to pay management personnel and department heads at Lincoln. The patients' trust account was the repository for patients' funds (social security checks, family gifts, etc.)

It was stipulated that appellant signed the two checks drawn on the patients' trust account. An employee of the Bank of America testified that appellant was also the signator on the Lincoln and Diversified Company payroll accounts. On September 26, 1975, a redeposit of $19,000 was made to the patients' trust account.

■ Appellant's initial contention on appeal is that a warrantless search of health care facilities, such as his own, for purposes of securing compliance with licensing regulations is violative of constitutional guarantees of privacy and that such a conclusion is mandated by *Marshall* v. *Barlow's, Inc., supra,* 436 U.S. 307 [56 L.Ed.2d 305].

In *Marshall,* the Supreme Court invalidated warrantless inspection provisions (29 U.S.C. § 657(a)) of the Occupational Safety and Health Act of 1970 (OSHA). Although, from appellant's point of view, the inspections conducted under OSHA may seem analogous to that conducted in the instant case, the two situations are not equivalent. Appellant's reliance on *Marshall* is misplaced. A brief history of the cases dealing with the permissible scope of administrative searches is necessary to place appellant's case in its proper context.

The validity of warrantless administrative searches was first considered by the United States Supreme Court in *Frank* v. *Maryland,* 359 U.S. 360 [3 L.Ed.2d 877, 79 S.Ct. 804], where, in a five-to-four decision, the court upheld the conviction of a homeowner who refused to permit a municipal health inspector to enter and inspect his residence without a warrant. In *Eaton* v. *Price,* 364 U.S. 263 [4 L.Ed.2d 1708, 80 S.Ct. 1463], a similar result was reached by an equally divided court. In 1966, the court again examined the issue. (*Camara* v. *Municipal Court,* 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727].) In the interim, government at all levels had

resorted to the increased use of such inspections, while the Supreme Court in cases such as *Mapp* v. *Ohio*, 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], and *Ker* v. *California*, 374 U.S. 23 [10 L.Ed.2d 726, 83 S.Ct. 1623], had refined and expanded its concept of the protection afforded by the Fourth and Fourteenth Amendments to the United States Constitution. (*Camara* v. *Municipal Court, supra*, 387 U.S. 523, 525 [18 L.Ed.2d 930, 933].) In *Camara*, after thoroughly reviewing the scope and purpose of administrative inspections and the nature and extent of the intrusion upon the right to privacy which they presented, the court, by a six-to-three vote, overruled *Frank* and held that warrantless administrative searches for the purpose of securing compliance with a municipal housing code violated the Fourth Amendment guarantee of privacy. (387 U.S. at p. 534 [18 L.Ed.2d at pp. 938-939].)

In a companion case, *See* v. *City of Seattle*, 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737], involving a routine inspection to secure compliance with the municipal fire code, the court extended the protection of the Fourth Amendment to administrative searches of portions of commercial premises not open to the public. *See* circumscribed its own scope, however, with the following proviso: "We do not in any way imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product. Any constitutional challenge to such programs can only be resolved, as many have been in the past, on a case-by-case basis under the general Fourth Amendment standard of reasonableness. . . ." (387 U.S. at pp. 545-546 [18 L.Ed.2d at pp. 947-948].)

The Supreme Court commenced its post-*See* case-by-case review of regulatory inspections of licensed industries in *Colonnade Corp.* v. *United States*, 397 U.S. 72 [25 L.Ed.2d 60, 90 S.Ct. 774]. There it reviewed a statute providing for warrantless inspection of the merchandise and business records[4] of liquor licensees. Focusing upon the lengthy history of government regulation of the liquor industry, dating back to colonial times, the court held that such "searches" met the Fourth Amendment test of reasonableness.

---

[4]The statute (26 U.S.C. § 5146(b)) called for inspection of "any records or other documents required to be kept by such dealer under this chapter or regulations issued pursuant thereto . . . ." (*Colonnade Corp.* v. *United States, supra*, 397 U.S. 72, 73, fn. 1 [25 L.Ed.2d 60, 62].)

In *United States* v. *Biswell,* 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593], the court reviewed a statute calling for inspection of the stock and records of licensed firearms dealers. It noted that there was not the same deep-rooted history of regulation in the firearms industry as there was in the liquor industry. It upheld the statute nonetheless, essentially on two theories. After first finding that the federal government had a legitimate interest in regulating interstate traffic in firearms, the court further found that in order to be effective, inspections to secure compliance with licensing regulations had to be frequent and unannounced, thus rendering warrantless inspections both necessary to the regulatory scheme and reasonable under the Fourth Amendment. The court contrasted the factual setting in *Biswell* from that in *See* where building code violations were difficult to conceal or to correct in a short time so that requiring that inspections be made pursuant to warrant did not jeopardize effective enforcement of the ordinance.

The second basis upon which the statute in *Biswell* was upheld was the court's conclusion that the inspections which it provided for posed only a limited threat to the firearms dealer's "justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection. Each licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority. 18 U.S.C. § 921(a)(19). The dealer is not left to wonder about the purposes of the inspector or the limits of his task. [¶] We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute. . . ." (406 U.S. at pp. 316-317 [32 L.Ed.2d at pp. 92-93].)

*Marshall* v. *Barlow's, Inc., supra,* 436 U.S. 307, unlike *Colonnade* and *Biswell,* dealt not with a regulatory scheme for a particular licensed industry, but with a statute which applies to all businesses engaged in interstate commerce. (29 U.S.C. §§ 652, 654.) *Marshall* in no way curtailed the scope of *Colonnade* and *Biswell*; in fact, it expressly approved the holding of those cases.

It is thus clear that there are two lines of cases and two sets of rules governing administrative searches. The first of these deals with general regulatory schemes—whether federal, state, or local—which apply to all

residences or all structures or all employers within the particular jurisdiction. *Camara* and *See* fall within this category, as does *Marshall.* The second line of cases involves regulatory legislation governing specific licensed industries. *Colonnade* and *Biswell* fall within this category. Appellant's situation falls within this second line of cases and must be evaluated accordingly.

The State of New York has upheld a statute authorizing warrantless inspections of licensed nursing homes upon the rationale of *Biswell.* (*Uzzillia* v. *Commissioner of Health,* 47 App.Div.2d 492 [367 N.Y.S.2d 795].) In California, the health care industry, while lacking the lengthy history of regulation of the liquor industry cited in *Colonnade,* is now, and for some years past has been, pervasively regulated.[5] A license is required to operate a skilled nursing facility. (Health & Saf. Code, § 1251.) The licensee of such a facility is subject not only to the regulations contained in chapter 2 of division 2, commencing with section 1250, but also to the additional regulations pertaining to "long-term health facilities" contained in chapter 2.4 of division 2 of the Health and Safety Code, commencing with section 1417, and to the administrative regulations in title 22 of the California Administrative Code promulgated in furtherance of the legislative scheme. The licensee is on notice that compliance with the statutes and regulations is a condition of his doing business.

The inspection provisions governing the health care industry are found in section 1278 which provides: "Any officer, employee, or agent of the state department may, upon presentation of proper identification, enter and inspect any building or premises at any reasonable time to secure compliance with, or to prevent a violation of, any provision of this chapter." and in section 1421 which provides:

"(a) Any duly authorized officer, employee, or agent of the state department may enter and inspect any long-term health care facility, including, but not limited to, interviewing residents and reviewing records, at any time to enforce any provision of this chapter. Inspections conducted pursuant to complaints filed with the state department shall be conducted in such a manner as to ensure maximum effectiveness. No

---

[5]Regulation of the health care industry dates back to 1945 when former sections 1400 to 1418 providing for licensing, inspection, regulation and supervision of public and private hospitals were enacted. (Stats. 1945, ch. 1418.) Expansion and revision of the pertinent legislation has continued since that time and has, over the years, involved reorganizing and renumbering of many Health and Safety Code provisions. Provisions for licensing institutions which care for the aged and infirm date back to 1925. (Pol. Code, §§ 2330-2346; Stats. 1925, ch. 18.)

advance notice shall be given of any inspection conducted pursuant to this chapter unless previously and specifically authorized by the director or required by federal law.

"(b) Any public employee giving such advance notice in violation of this section shall be deemed to be in violation of subdivision (t) of Section 19572 of the Government Code and shall be suspended from all duties without pay for a period determined by the director."

The majority of patients of skilled nursing homes and other long-term health care facilities are, for the most part, not only in need of physical care, but are also incapable of looking after their own financial affairs. In addition to being physically infirm, most are elderly. Many lack family members who can oversee either the physical care they receive or the management of their financial resources. The expenses of many of the patients of such facilities are paid out of public funds. If the state does not assume responsibility for their welfare through the medium of licensing and inspection there is no one else that can or will.[6] The state's legitimate interest in regulating the industry needs no further elaboration.

As in *Biswell,* the nature of the industry and of the abuses to which it is subject require that inspections, to be effective, be both frequent and unannounced. It is, of course; obvious that such inspections are crucial to the effective oversight of the physical wellbeing of patients, to assure that they are not neglected or even abused. Frequent, unannounced inspections are also essential to effective protection of patients' financial welfare.[7] Financial records can easily be concealed or even falsified. Patients are helpless to protect themselves. Unlike workers who can report OSHA violations, confidentially—or even anonymously if they are concerned about job security—most nursing home patients are neither aware of, nor capable of protesting, misuse of their funds. The knowledge that records can be examined without prior notice is the surest guarantee that nursing home licensees will fulfill their fiduciary responsibilities toward their patients. Such inspections are also the most effective method

---

[6]For a more detailed discussion of the physical, psychological and financial conditions of most nursing home patients, see Nursing Homes in California, Assembly Committee on Health, Interim Hearing, November 1977; Nursing Home Abuses, Hearings Before the Subcommittee on Oversight and Investigation of the Committee on Interstate and Foreign Commerce, House of Representatives, 95th Congress, 1st Session; Nursing Home Care in the United States: Failure of Public Policy, Supporting Paper No. 7, Subcommittee on Long-Term Care of the U.S. Senate Special Committee on Aging, March 1976.

[7]As noted, the statutes in both *Colonnade* and *Biswell* called for inspections of business records.

of assuring that those who fail to fulfill these responsibilities are identified so that their conduct can be corrected or their licenses revoked. The necessity for unannounced warrantless inspections in the long-term health care industry is just as great as in the firearms industry and such inspections are, therefore, reasonable within the meaning of the Fourth Amendment.

As for appellant's further contention that section 1431[8] precludes there being a voluntary consent to a warrantless inspection, as far back as 1968, it was held that there is a ". . . fundamental premise that acceptance of a license to operate a hospital is an implied consent to such supervision and inspection as is required by the licensing statute involved." (*People* v. *White*, 259 Cal.App.2d Supp. 936 [65 Cal.Rptr. 923].) In *Marshall*, too, the court cited the implied consent of a businessman in a regulated industry to the restrictions placed upon him. (*Marshall* v. *Barlow's, Inc., supra*, 436 U.S. at p. 313 [56 L.Ed.2d at pp. 311-312].) In *Biswell*, however, the court analyzed the situation differently: "When the officers asked to inspect respondent's locked storeroom, they were merely asserting their statutory right, and respondent was on notice as to their identity and the legal basis for their action. Respondent's submission to *lawful* authority and his decision to step aside and permit the inspection rather than face a criminal prosecution [fn. omitted] is analogous to a householder's acquiescence in a search pursuant to a warrant when the alternative is a possible criminal prosecution for refusing entry or a forcible entry. In neither case does the lawfulness of the search depend on consent; in both, there is lawful authority independent of the will of the householder who might, other things being equal, prefer no search at all. . . . In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." (*United States* v. *Biswell, supra*, 406 U.S. at pp. 314-315 [32 L.Ed.2d at pp. 91-92].)[9] (Italics in original.)

Regardless of whether the justification advanced is the legal fiction of implied consent as in *White*, or *Biswell's* judicial circumscription on what expectations of privacy are reasonable for a business licensee, the end result is the same. Acceptance of the license carries with it the burden of submission to inspections which reasonably further enforcement of the regulatory scheme.

---

[8]See footnote 3 *ante.*
[9]The federal statute also made it a crime to refuse to allow inspection.

■ Appellant argues that the Health and Safety Code inspection provisions do not meet the test of reasonableness set forth in *Biswell* because they are not "carefully limited in time, place, and scope." (406 U.S. at p. 315 [32 L.Ed.2d at p. 92].) Section 1278 provides that entry may be made "at any reasonable time." Inspection may be made "to secure compliance with, or to prevent a violation of, any provision of . . . [chapter 2]." Entry is limited to officers, employees, or agents of the state Department of Health, and only upon presentation of proper identification. Although section 1278 refers to inspection of "any building or premises" it is clear from the context in which these words are used that the statute is in fact talking about any *licensed* building or premises. Section 1278 is sufficiently circumscribed as to time, place, and scope to pass constitutional muster.

■ Section 1421 also limits entry to officers, employees, and agents of the state department. The purpose of entry is limited to enforcement of provisions of chapter 2.4. Long-term health care facilities are expressly designated as the premises to be inspected. Section 1421 differs from section 1278 in two respects: it expressly authorizes review of the facility's records rather than just its premises; and it authorizes entry "at any time." Appellant argues that this latter provision renders section 1421 overly broad and that since section 1278 does not provide for inspection of records, there is no valid statute authorizing the search which Batchkoff made. Typically, inspection statutes call for entry during business hours. (*United States* v. *Biswell, supra,* 406 U.S. 311; 18 U.S.C. § 923(g); *Colonnade Corp.* v. *United States, supra,* 397 U.S. 72; 26 U.S.C. § 5146(b).) Long-term health care facilities, by statutory definition (Health & Saf. Code, § 1418), provide 24-hour skilled nursing services. They have no business hours per se. Within this industry, a provision for inspection at any time is not only reasonable, it is essential to successful enforcement of the regulatory provisions.

Although an inspection of business records in the dead of night might prove to be unreasonable, the statute on its face is not. (5) Since inspections to enforce licensing provisions form an exception to the Fourth Amendment requirement that warrants be obtained, a showing that inspection was made pursuant to such a statute is sufficient to place the burden of proof on the defendant to show that a particular search was conducted in an unreasonable manner. There was no showing in the present case that Batchkoff's inspection occurred during anything other than normal daytime business hours. Thus there was no showing that the inspection was in any way unreasonable.

■ Appellant next contends, constitutional considerations aside, California statutorily provides for issuance of administrative inspection warrants (Code Civ. Proc., § 1822.50)[10] and that issuance of such a warrant is therefore a precondition to conducting all administrative inspections. The history set forth above of the development of the body of law governing administrative searches makes it patently clear that Code of Civil Procedure, section 1822.50, was intended to comply with the rule enunciated in *Camara, supra,* 387 U.S. 523, and *See, supra,* 387 U.S. 541, and is applicable only to situations falling within the purview of that line of cases. Code of Civil Procedure, section 1822.50, has no applicability to inspections of licensed businesses which are governed by the rules enunciated in *Colonnade, supra,* 397 U.S. 72, and *Biswell, supra,* 406 U.S. 311.

■ Appellant next contends that the Legislature did not delegate to the Department of Health the authority to make commingling a crime, that it, therefore, was without jurisdiction to adopt California Administrative Code, title 22, section 72557. Appellant concedes that: "The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the 'power to fill up the details' by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect, and provision by the Legislature that such rules and regulations shall have the force, effect, and sanction of law does not violate the constitutional inhibition against delegating the legislative function. [Citations.]" (*First Industrial Loan Co. v. Daugherty,* 26 Cal.2d 545, 549 [159 P.2d 921].) The power to adopt rules and regulations to effectuate legislative policy with respect to the health care industry is conferred upon the state Department of Public Health by Health and Safety Code section 1275. The Legislature has retained unto itself, however, the power of declaring the penalty for violation of such rules and regulations. (Health & Saf. Code, § 1290.) The delegation of power to the department is, therefore, constitutionally valid. (*People* ex rel. *Younger* v. *County of El Dorado,* 5 Cal.3d 480, 496 [96 Cal.Rptr. 553, 487 P.2d 1193].) Appellant makes no showing that the regulation prohibiting commingling is not reasonably calculated to further the general regulatory policy set forth by the Legislature. The mere fact that restrictions against commingling are imposed on other professions (e.g.,

---

[10]Code of Civil Procedure, section 1822.50, provides: "An inspection warrant is an order, in writing, in the name of the people, signed by a judge of a court of record, directed to a state or local official, commanding him to conduct any inspection required or authorized by state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, or zoning."

real estate brokers and escrow companies) by way of statute (Bus. & Prof. Code, §§ 10145, 10185, 17409, 17444) is immaterial.

There is likewise no merit to appellant's contention that the trial court erred in refusing to permit evidence or argument as to appellant's possible good-faith belief that he had a right to commingle patients' funds with his own. His theory appears to be that because embezzlement, a more serious offense than commingling, is a specific intent crime, as to which a good-faith claim of title constitutes a defense (Pen. Code, § 511), commingling must also be. The notion that a less serious offense must include all of the elements of a more serious related offense is certainly novel, though unpersuasive. ■ Commingling by a nursing home licensee consists of the licensee's mixing a patient's funds with his own. The danger which such conduct presents is that the patient's funds may be subjected to the claims of the licensee's creditors and ultimately be lost. (*Peck* v. *The State Bar*, 217 Cal. 47 [17 P.2d 112].) This danger exists regardless of the licensee's good-faith belief in his right to treat the patient's funds in this fashion or of his intention eventually to return them to the patient. The offense requires no greater intent than the licensee's intent to mingle the patient's funds with his own.

■ Appellant next contends that his conviction must be reversed because the trial court improperly stated that he was guilty. The contention is grounded upon the giving of the following instruction, the italicized portion of which forms the basis for appellant's claim:

*"The fact that I'm submitting this case to you for your verdict shows I have determined as a matter of law that there is sufficient evidence lawfully before you to support a verdict that the Defendant is guilty as charged.*

"Whether or not you individually reach a decision or verdict of guilty depends upon your individual determination under all of my instructions, of the credibility of the testimony and other evidence that supports the charge, upon your assessment of the weight and value of such evidence, and finally, after your consideration of all of the evidence in this case, upon whether or not you are satisfied beyond a reasonable doubt and to a moral certainty that the Defendant is indeed guilty as charged.

"If you individually are so satisfied that the Defendant is guilty as charged, then your individual decision and verdict must be that he is guilty.

"If you individually are not so satisfied that the Defendant is guilty as charged, then your individual decision and verdict must be that he is not guilty."

The portion complained of cannot be viewed in isolation. The remainder of the instruction makes clear that the decision as to guilt or innocence rested entirely with the jury. Other instructions given by the trial court reinforced that directive. The error, if any, in giving the italicized portion of the instruction was entirely harmless.

Finally, appellant contends that the sentence imposed upon him was an abuse of discretion both because the trial court acted in the erroneous belief that appellant had not restored all patients' funds to them and because his age and previous unblemished record rendered him an unsuitable candidate for a jail sentence. We need not reach the question of whether the trial court abused its discretion in imposing the sentence it did when it did because we believe that appellant's age,[11] his health as described in the probation report in file, and the fact that he has been free on bail for over two years, indicate the advisability of obtaining a new probation report and holding a new sentencing hearing. At such hearing, the trial court should satisfy itself as to whether restitution is in order or whether patients' funds were fully restored.

The cause is remanded for a new sentencing hearing. In all other respects the judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied May 17, 1979, and appellant's petition for a hearing by the Supreme Court was denied July 25, 1979.

---

[11] Appellant is presently 73 years old.