RIVIERA MANOR, INC., Plaintiff-Appellant, v. THE DEPARTMENT OF PUBLIC HEALTH *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—87—3818

Opinion filed December 22, 1988.

George B. Collins and Sandra L. Hertzberg, both of Collins & Bertelle, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Rita M. Novak and Daniel T. Gillespie, Assistant Attorneys General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Riviera Manor, Inc. (Riviera), is a licensed nursing home which was cited for several violations of the 1967 National Fire Protection Association Life Safety Code (see 77 Ill. Adm. Code 200.906 (1986)) (Life Safety Code) by the defendant, the Illinois Department of Public Health (Department). Following administrative proceedings, the Department assessed a $5,000 penalty and imposed a six-month conditional license. Riviera filed a complaint for administrative review, and the trial court confirmed the decision of the Department. Riviera has appealed, contending that: (1) the findings of the Department concerning the alleged violations of the Life Safety Code were against the manifest weight of the evidence; (2) the Department abused its discretion in classifying the purported violations as "type A" violations supporting imposition of the most severe penalties; (3) the inspection provisions of the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1985, ch. 111½, par. 4151—101 *et seq.*) (Act) are unconstitutional; (4) even if the Act is constitutional, the Department agents exceeded their authority in conducting an unreasonable inspection of the facility; and (5) the hearing officer abused his discretion in refusing to admit certain evidence offered by Riviera.

Riviera is licensed as a skilled and intermediate care facility owned and operated by Gus Potekin. In the early 1970s Riviera began to ac-

cept mental patients from State-operated facilities, and at the time of the administrative proceedings here, approximately 90% of its 170 residents were chronically mentally ill or severely retarded. Because of the nature of its resident population, Riviera experienced serious problems with patients wandering out of the facility.

On September 19, 1985, the Department received a hot-line complaint concerning safety violations at Riviera. Pursuant to this complaint, Department inspector Mario Vitale went to the facility at approximately 10 a.m. on September 25, 1985, to conduct an on-site inspection. Vitale was an architect and as such was concerned with the life-safety aspects of the facility. Vitale testified that when he arrived at Riviera, he observed two sets of doors at the front entrance. The outside doors led to a foyer and were unlocked. However, the interior foyer doors were locked and controlled by a buzzer located at the front desk. When Vitale asked whether Riviera had approval for electric locks, he was shown a copy of a letter from Gus Potekin to a Department administrator, Helen Steadman, thanking her for "granting us the use of an electric buzzer on the two interior doors." The letter was dated September 24, 1971.

Once inside, Vitale was accompanied on his inspection by Riviera's administrator, Betty Frey. During the inspection, he observed that the hallway door leading to Room 124 was secured with a dead-bolt cylinder lock. Although there was a lighted exit sign above the door, it could not be opened without a key and did not have panic hardware. Vitale defined panic hardware as a device used to disengage a locked door in the event of an emergency. Upon gaining access to Room 124, Vitale observed that the door leading to the outside was locked by means of a horizontal latch bolt going from the door into the door frame. The bolt was located approximately 10 inches above the floor. An exit sign above the door was not lighted, and although the door had panic hardware, it could not be operated because of the latch bolt near the floor.

Vitale further testified that the hallway door leading to Room 138 was secured by a dead-bolt lock. The door providing egress from Room 138 to the outside of the building opened into an area closely confined by a chain link fence secured by a locked gate. Vitale stated that there was no safe area of refuge between the door and fence.

On the southeast side of the building, there was an exit provided by two doors. The right door was inoperable. The left door opened, but provided inadequate clearance and did not latch properly. There were two doors allowing egress from the basement. One led to a ramp which ended at a padlocked chain link fence, and the other led to a stairway

which ended near the locked foyer doors.

As a result of his inspection, Vitale concluded that 4½ of the 8 available exit doors were locked. Two of the remaining doors led to areas closely confined by a fence. Only one exit provided access to a public way. Vitale testified that in his opinion, the locked doors constituted a "type A" violation under the Act, which is defined as a violation "presenting a substantial probability that death or serious mental or physical harm to a resident will result therefrom." Ill. Rev. Stat. 1985, ch. 111½, par. 4151—129.

Vitale conducted a second inspection which began on the evening of October 8, 1985, and continued into the early morning hours of the following day. Vitale was accompanied by Daniel Schmidt, a State Police officer assigned to the Department. Vitale and Schmidt toured the outside of the facility for 15 minutes, then knocked at the front door and showed their photo identification cards to a woman who appeared at the door. She told them that she had to get the keys and walked away. After waiting approximately five minutes, the agents slipped the mechanism on the lock and gained entry to the facility. During the inspection that followed, Vitale and Schmidt found substantially the same conditions that existed on September 25. An incident report prepared by a Riviera employee concerning the October 8, 1985, inspection was not admitted into evidence.

Gus Potekin testified that Riviera had received permission from the Department for the front-door buzzer in 1971 and referred to the letter he wrote to Helen Steadman thanking Steadman for granting permission for the buzzer. Potekin stated that he showed the letter to the State Fire Marshall, who approved the facility on October 4, 1971. Potekin claimed that he had received permission to place locks on Rooms 124 and 138 and on the gate at the end of the basement ramp in 1974. Because of the serious problem of residents wandering out of the facility, Potekin drew up a floor plan showing the doors which were to be locked and submitted the plan for approval to Helen Steadman. According to Potekin, the letter referred to section 10—0004 of the Life Safety Code, which pertains to the locking of doors in buildings housing psychiatric patients. The attached floor plan, which was admitted into evidence at the administrative hearings, was dated March 4, 1974, and showed red Xs on the front interior doors, the hallway doors leading to Rooms 124 and 138, the east dining-room exit and the gate outside the basement ramp. The plan also contained the notation, written in red, "or where ever necessary from time to time." The plan was marked "received for tentative approval" by a Department health surveyor, Nicholas Colaizzi.

Potekin testified that in response to his request to secure the areas in question, he received a letter from the Department's program architect, Don Jardine. The letter was dated June 6, 1974, and stated as follows:

"The Department is approving the request made by you and the subject home regarding locks on designated doors as permitted by the Life Safety Code of 1967.

This approval takes into consideration the heavy emphasis you placed on the type of patients in said home. Another factor regarding this is that the said home is a one story building.

Apparently, permission was obtained by you from the State Fire Marshall's office.

Please send a surveyor out to make sure that the staff has access to keys and are inserviced on the use of said keys. This will have to be done in order to satisfy the reluctance of some members of the department in granting this permission."

Throughout the years, this letter was presented to various State and local inspectors who objected to the locked doors. Thomas Maher, an inspector from the State Fire Marshall's office, testified that although he objected to the lock on Room 124 and felt "uncomfortable" approving it, he felt the matter had been decided by a higher authority after he was shown Jardine's letter.

Potekin testified that Riviera held 36 fire drills each year and that several copies of the master key were kept in a firebox at each nurse's station.

Don Jardine testified that he did not recall the specific circumstances surrounding Potekin's request in 1974 to lock various doors at Riviera. He did state, however, that in his 28 years of experience with the Department he has never approved a dead-bolt cylinder lock such as the ones placed on Rooms 124 and 138. He stated that dead-bolt locks do not fulfill the requirement that egress be ensured in the event that no one with a key is nearby when a fire breaks out. Jardine testified that if a keyed lock is used, the door must be equipped with a device which releases the lock in case of an emergency.

At the conclusion of the administrative hearing, the hearing officer determined that the evidence established the following type A violations: (1) the hallway door of Room 124 was locked by a dead-bolt cylinder lock; (2) the outside door of Room 124 was secured shut by a slide-bolt latch; (3) the front interior doors were locked and required a key to exit; (4) only one leaf of the southeast exit door was operable; (5) the east dining-room door was locked despite the fact that it was designated as an exit on the evacuation plans; (6) egress from the base-

ment was hindered by a locked exit door and a padlocked chain link fence. The hearing officer recommended the imposition of a six-month conditional license as a result of these violations, but recommended that the $5,000 fine mandated by section 3—305(1) of the Nursing Home Care Reform Act be waived because Riviera had expended $5,400 for new locking equipment. (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—305(1).) The hearing officer also made a number of findings regarding type B and type C violations. However, Riviera does not appear to challenge these findings on appeal, and we will therefore not address them in this opinion.

On December 30, 1986, after entertaining Riviera's written objections to its proposed decision, the Director of the Department issued a final decision adopting the hearing officer's finding and recommendation as to the six-month conditional license. However, the Department did not adopt the hearing officer's recommendation as to waiver of the fine and assessed a $5,000 fine against Riviera based upon the type A violations. This decision was confirmed by the circuit court on November 23, 1987.

Riviera first contends that the finding that the locked doors constituted a type A violation was against the manifest weight of the evidence. Riviera makes three specific arguments with respect to this contention: first, that section 10—0004 of the Life Safety Code permitted the locking of those doors based upon the population of psychiatric patients; second, that Riviera had Department approval for the locked doors dating back to 1974; and third, that the alleged violations of the Life Safety Code were not in fact supported by the record.

■ Regarding the first argument, section 10—0004 of the Life Safety Code provides as follows:

"It is recognized that in buildings housing various types of psychiatric patients, or used as penal institutions, it is necessary to maintain locked doors and barred windows that are equipped to confine and protect building inhabitants. Regarding this necessity, other sections of this code requiring the keeping of exits unlocked *may be waived by the authority having jurisdiction*. It is also recognized that some psychiatric patients are not capable of seeking safety without adequate guidance. In buildings where these conditions exist, reliable means for the rapid release of occupants shall be provided, such as the remote control of locks, or by keying all locks to keys commonly carried by or immediately available to attendants." (Emphasis added.)

Riviera maintains that the above-quoted section of the Life Safety Code permitted the locking of the doors in question based upon the

resident population of psychiatric patients and the fact that there was a master-key system as well as 24-hour supervision at the home. It argues, therefore, that no waiver was required under the Code. We are not persuaded by this argument because the very wording of section 10—0004 states that the Code provisions regarding keeping doors unlocked "may be waived by the authority having jurisdiction." The question then is whether such a waiver was in fact obtained by Riviera.

■ Riviera's position, which forms the basis of its second argument, is that the letter by Don Jardine dated June 6, 1974, and quoted earlier in this opinion constituted a waiver of the Code's requirement of keeping doors unlocked. Riviera maintains that it relied upon the language of the letter approving "locks on designated doors" and that the Department should therefore be estopped from finding that the locks violated the Life Safety Code. The "designated doors" mentioned in the June 6 letter apparently referred to the floor plan submitted by Riviera which showed red Xs on certain exits. The floor plan, however, does not designate locks on all of the exits which the hearing officer found to have been locked or obstructed in violation of the Code. Moreover, the letter contains no mention of the type of locks for which Department approval was purportedly obtained. Don Jardine testified that with regard to dead-bolt locks and slide-bolt locks, "by just common knowledge, common experiences, this type of lock could never be approved anywhere anyplace." Although Jardine did not specifically recall the request made by Riviera in 1974, he testified that he had never approved a dead-bolt lock because of the danger such locks would pose in the event of an emergency. The findings of the administrative agency with respect to this question of fact are based upon the credibility of the witnesses and accordingly entitled to great deference. (*Markowski v. Edgar* (1986), 151 Ill. App. 3d 176, 502 N.E.2d 1304.) The fact that Riviera was able to persuade State and local inspectors since 1974 that Department approval for the locks had been obtained provides no basis for overturning the director's decision.

■ Riviera's third argument is that the factual findings that certain doors were locked in violation of the Life Safety Code were not supported by the record. It claims that two of the locked doors were not intended as fire exits and therefore did not violate the Life Safety Code. Riviera also maintains that the slide-bolt latch on the exit door of Room 124 was placed 10 inches above the floor so that it would be obvious to people crawling on the floor in an effort to avoid smoke inhalation. The record shows that the hearing officer reviewed the evacuation plan and heard the testimony of the witnesses regarding the violations in question. In our view, these matters are uniquely fac-

tual in nature and were properly resolved by the trier of fact.

■■ Riviera next contends that the Department failed to meet its burden of showing that the locked doors constituted a type A rather than a type B violation. A type A violation is defined as a violation which "creates a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm to a resident will result therefrom." (Ill. Rev. Stat. 1985, ch. 111½, par. 4151—129.) A type B violation is one which "creates a condition or occurrence relating to the operation and maintenance of a facility directly threatening to the health, safety or welfare of a resident." Ill. Rev. Stat. 1985, ch. 111½, par. 4151—130.

The Department presented the testimony of Mario Vitale and Don Jardine on the issue of whether the locked doors created a substantial probability of death or serious harm sufficient to support their classification as a type A violation. Both testified that the locks used by Riviera would improperly obstruct egress from the building in the event of a fire or other emergency. However, the testimony of Gus Potekin and other witnesses on behalf of Riviera established that the residents were under full 24-hours supervision and that the locks were all keyed to master keys which were readily available to staff members during an emergency. The record shows that staff members were frequently instructed on the master-key system and that 36 fire drills were conducted each year. Furthermore, Riviera had passed a multitude of inspections from State and local agencies, including inspections by the State Fire Marshall, since 1974. In our view, this evidence militates against the Department's conclusion that the violations were so severe as to create a substantial probability of death or great harm to the residents. We are aware of the proposition that courts will not ordinarily interfere with the discretionary authority of an administrative body unless it has been exercised in an arbitrary or capricious manner. (*Neff v. Miller* (1986), 146 Ill. App. 3d 395, 496 N.E.2d 1073.) In the instant cause, however, it appears that the Department's decision to classify the violations as type A rather than type B lacks a reasonable basis and must accordingly be reversed. (See *City of Hurst v. Illinois Commerce Comm'n* (1983), 120 Ill. App. 3d 354, 458 N.E.2d 568.) The type A violations assessed by the Department are accordingly reduced to type B violations.

Riviera next contends that the inspection provisions of the Nursing Home Care Reform Act of 1979 are unconstitutional because they fail to provide procedural safeguards limiting the time, place, scope and manner of entry with respect to administrative inspections.

The inspections conducted on September 25, 1985, and October 8 and 9, 1985, were conducted pursuant to the authority of sections 3—107 of the Act, which provides as follows:

"The Department and the city, village or incorporated town shall have the right at any time to visit and inspect the premises and personnel of any facility for the purpose of determining *** compliance with this Act or with the local ordinances which govern the regulation of the facility." (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—107.)

Section 3—212(b) provides:

"In determining whether to make more than the required number of unannounced inspections *** the Department shall consider one or more of the following: previous inspection reports; the facility's history of compliance with standards, rules and regulations promulgated under this Act and correction of violations, penalties or other enforcement actions; the number and severity of complaints received about the facility; any allegations of resident abuse or neglect; weather conditions; health emergencies; other reasonable belief that deficiencies exist." (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—212(b).)

Section 3—214 provides:

"Any holder of a license *** shall be deemed to have given consent to any authorized officer, employee or agent of the Department to enter and inspect the facility in accordance with this Article. Refusal to permit such entry or inspection shall constitute grounds for denial, nonrenewal or revocation of a license ***." Ill. Rev. Stat. 1985, ch. 111½, par. 4153—214.

■ Statutes providing for warrantless administrative searches in closely regulated industries have been upheld where: (1) the government's interest in regulating the industry is substantial; (2) the warrantless inspections are necessary to further the regulatory scheme; and (3) the statutory inspection provides a "constitutionally adequate substitute for a warrant." (*New York v. Burger* (1987), 482 U.S. 691, 702, 96 L. Ed. 2d 601, 614, 107 S. Ct. 2636, 2644.) In order to fulfill the requirement that the statute provide an adequate substitute for a warrant, "it must advise the owner of commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." (*Burger*, 482 U.S. at 703, 96 L. Ed. 2d at 614, 107 S. Ct. at 2644.) A statute will be found to satisfy the requirement of limiting the discretion of the inspecting officers if it is "carefully limited in time, place and scope." *Burger*, 482 U.S. at 703, 96 L. Ed. 2d at 614, 107 S. Ct. at

2644.

█ Riviera does not contest the fact that the nursing-home industry is a closely regulated industry. It also concedes that the government has a substantial interest in regulating the industry and that warrantless inspections are necessary to further the regulatory scheme. Riviera contends that the statute in question, however, does not properly limit the discretion of the inspecting officers because it fails to carefully limit the authorized inspections with respect to time, place and scope.

Although this appears to be the first such constitutional challenge to the inspection provisions of the Illinois Act regulating the nursing-home industry, the Department has called our attention to a California case in which similar provisions were upheld. In *People v. Firstenberg* (1979), 92 Cal. App. 3d 570, 155 Cal. Rptr. 80, *cert. denied* (1980), 444 U.S. 1012, 62 L. Ed. 2d 641, 100 S. Ct. 660, the California Appellate Court upheld a statute which provided:

> " 'Any duly authorized officer, employee, or agent of the state department may enter and inspect any long-term health care facility, including, but not limited to, interviewing residents and reviewing records, at any time to enforce any provision of [the health and safety code]. Inspections conducted pursuant to complaints filed with the state department shall be conducted in such a manner as to ensure maximum effectiveness. No advance notice shall be given of any inspection conducted pursuant to this chapter unless previously and specifically authorized by the director or required by federal law.' " (*Firstenberg*, 92 Cal. App. 3d at 579-80, 155 Cal Rptr. at 85, quoting Cal. Health & Safety Code §14.21 (West 1979).)

The plaintiff in *Firstenberg*, like Riviera in the instant cause, argued that the statute in question was not sufficiently circumscribed as to time, place and scope. The court noted that the statute limited entry to officers, employees and agents of the State Department charged with regulating the nursing-home industry and further limited the purpose of entry to the enforcement of the provisions contained in the Health and Safety Code. With respect to the statute's authorization of entry "at any time," the court stated "[l]ong-term health care facilities, by statutory definition [citation], provide 24-hour skilled nursing services. They have no business hours per se. Within this industry, a provision for inspection at any time is not only reasonable, it is essential to successful enforcement of the regulatory provisions." *Firstenberg*, 92 Cal. App. 3d at 582, 155 Cal. Rptr. at 87.

Like the statute considered in *Firstenberg*, the inspection provi-

sion of the Act before us limits entry to Department personnel for the specific purpose of determining whether the facility is in compliance with the Act or the local ordinances regulating the facility. (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—107.) Furthermore, section 3—212(b) sets forth certain criteria to be used by the Department in determining whether to conduct more than one inspection in a year. (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—212(b).) Among the criteria listed are "the number and severity of complaints received about the facility" and "any allegations of resident abuse or neglect." (Ill. Rev. Stat. 1985, ch. 111½, par. 4153—212(b).) With respect to the Act's authorization of inspections "at any time," we agree with the Department's position that the provision is reasonable considering the type of facility regulated and the need to "ascertain fully and realistically the nature and quality of the day-by-day care and protection being afforded the patient." *Uzzillia v. Commissioner of Health* (1975), 47 A.D.2d 492, 497, 367 N.Y.S 2d 795, 801.

■ Riviera next contends that even if we find the Act constitutional, the Department agents exceeded their authority in conducting the inspection on October 8 and 9, 1985. The Department asserts that all of the evidence concerning the locked door violations was discovered by Agent Vitale during his September 25, 1985, inspection, which Riviera does not challenge as unreasonable. Riviera does not counter this assertion in its reply brief, and Vitale's testimony that his October 8 and 9 inspection revealed substantially the same conditions as the September 25 inspection appears to support the Department's position. For this reason, it is not necessary for us to consider Riviera's contentions that the agents exceeded the scope of their authority in conducting the October 8 and 9 inspection and that the hearing officer abused his discretion in refusing to admit an incident report detailing the agents' behavior during that inspection.

Accordingly, the judgment of the circuit court is reversed insofar as it confirms the Department's finding of type A violations and the resulting $5,000 fine and six-month conditional license. The violations are reduced to type B violations, and the cause is remanded to the circuit court with directions to remand to the Department for consideration of any appropriate penalty. The judgment of the circuit court is affirmed in all other respects.

Affirmed in part; reversed and remanded in part.

JOHNSON and McMORROW, JJ., concur.