Cecil D. ANDRUS, Secretary, United States Department of the Interior, Plaintiff,

v.

P-BURG COAL COMPANY, INC., Defendant.

No. TH 79–163–C.

United States District Court, S. D. Indiana, Terre Haute Division.

June 5, 1980.

Virginia Dill McCarty, U.S. Atty., Harold R. Bickham, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff.

Harold E. Hutson, Indianapolis, Ind., for defendant.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

This matter comes before this Court upon application by plaintiff for a preliminary injunction to enjoin defendant, P-Burg Coal Company, Inc., and any of its officers or agents from refusing to allow plaintiff's representatives onto defendant's mining operation in order to conduct inspections called for by the Surface Mining Control and Reclamation Act of 1977. The ultimate relief sought is a permanent injunction to the same effect. Jurisdiction is based on 28 U.S.C. § 1343 and 30 U.S.C. § 1271(c). Defendant maintains that plaintiff's representatives must obtain a search warrant before being able to inspect defendant's mining operation. On October 12, 1979, this Court heard the evidence. Pursuant to Rule 65(a)(2), F.R.Civ.P., trial of the action on the merits is advanced and consolidated with the hearing of the application.

### Facts

The essential facts are not in dispute. Authorized representatives of the Department of the Interior appeared at the defendant's surface mining operation in Clay County, Indiana. They presented their credentials to an officer of the defendant and informed him that they had come to make an inspection as authorized by the Surface Mining Control and Reclamation Act. The Interior Department officials did not have a search warrant. The officer of the defendant refused to admit the Interior Department officials, and they left without making an inspection. No inspection has occurred to date.

### Discussion

There are two issues involved in plaintiff's request for an injunction. One is whether the commerce clause gives Congress the power to regulate defendant's mining operation under the Surface Mining Control and Reclamation Act. If the act does extend to defendant's mining operation, the second issue is whether warrantless searches under the act are constitutional.

While no cases were found discussing the constitutional reach of the Surface Mining and Reclamation Act, several courts have reached the issue with respect to the Coal Mine Health and Safety Act of 1969. These cases provide some guidance in deciding how far the commerce power of the federal government extends in the mining industry.

In *Morton v. Bloom*, 373 F.Supp. 797 (W.D.Pa.1973), the court held that the Coal Mine Health and Safety Act did not apply to the one-man, owner-operated coal mine in question. The court emphasized that Congress did not intend for the Act to apply to one-man mines since the Act sought to ensure that the mine owner's desire for profit did not override considerations of safety for his workers. Since a one-man operation by its nature requires one to impose one's own safety provisions to ensure one's continued livelihood, the Act was unnecessary and inapplicable. There is no inherent conflict between owner's profits and worker safety when the owner is the sole worker. At 798–799. The court also held that the one-man operation in question was outside the reach of the commerce power of the federal government. The court noted that the defendant sold his coal intrastate and only bought some of his equipment from out-of-state suppliers. The court reasoned that such intrastate commerce in coal could be regulated by the federal government only if such commerce substantially affected interstate commerce or substantially interfered with the power to regulate interstate commerce. Defendant's activity, the court concluded, did not have this substantial effect. At 798–799.

While *Bloom, supra*, could be read to limit the reach of mine regulations to mines that substantially affect interstate commerce, the court appeared more concerned with the one-man nature of the mine operation and the fact that the conflict between profits and safety on which the Act was based was not present in a one-man mine.

To the extent that the court did lay down a requirement that a mining operation's activity substantially affect interstate commerce before being subject to federal regulations, more recent cases have developed less stringent concepts of "affecting commerce."

In *Secretary of the Interior, U. S. Dept. of Interior v. Shingara*, 418 F.Supp. 693 (M.D.Pa.1976), the court held the Coal Mine Health and Safety Act applicable to a two-man mine operation in Pennsylvania. The court noted that the mine sold its coal to another Pennsylvania businessman who in turn resold the mine's coal along with coal from other mines to yet another Pennsylvania company which ground down the coal and sold it to customers outside the state. The court concluded that, while the mine was twice removed from the eventual interstate sale, the mine's coal clearly entered interstate commerce and thus was subject to federal mine regulation. At 694. In addition, the court found that the mine was subject to federal controls because it affected interstate commerce.

Part of this effect on interstate commerce stemmed from the fact that the mine purchased equipment made outside the state and had a truck insured by a multi-state corporation. But the court's conclusion did not rest on these two items; rather, the court reasoned that the broad interpretation of the commerce clause by the Supreme Court mandated the holding that this mine affected commerce. The court analyzed *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), which held that wheat grown wholly for home consumption was subject to federal regulation because it supplied personal needs which otherwise would have been satisfied in the open market, which included wheat growers from out of state. In light of this expansive approach, the court felt obligated to find that the two-man mine also affected commerce in that suppliers from outside the state might well supply the coal which this mine supplied. At 695.

Another court used this expansive concept of "affecting commerce" in determining the reach of mining regulations. In *Marshall v. Bosack*, 463 F.Supp. 800 (E.D. Pa.1978), defendant argued that its Glen Worth mining operation was exempt from the Coal Mine Health and Safety Act, pointing out that it sold all of its coal within Pennsylvania. The court nevertheless held that the mine affected interstate commerce:

"The Act does not require that the effect on interstate commerce be substantial; any effect at all will subject Glen Worth to the Act's coverage. Even though coal processed at Glen Worth is sold intrastate only, its products compete with those of out-of-state producers. Therefore, local users might be forced to purchase interstate if Glen Worth did not produce coal. [citations omitted] Because of this "ripple effect", defendants' operations do affect commerce. I might add parenthetically that the cumulative impact of all intrastate sales of coal certainly has a substantial impact upon interstate commerce." At 801.

The court also noted that Congress had made a specific finding that disruption of production caused by mine accidents impedes interstate commerce. Therefore, it made no difference if a mine sells its coal intrastate since it is the disruption of any coal production that affects interstate commerce. At 801.

■ In light of the expansive interpretations given to the concept of "affecting commerce" by the United States Supreme Court (see e. g., *Wickard v. Filburn, supra* ) and in light of the broad sweep given the commerce power by the courts which have examined the reach of federal mine safety regulations, it would appear that the defendant's surface mining operation does affect interstate commerce and thus is subject to the Surface Mining Control and Reclamation Act of 1977. Defendant sells all of its coal production to customers located within Indiana, and none of these customers sells the coal or any of their products made from the energy gotten by burning the coal interstate. Nevertheless, while defendant's coal may not enter interstate commerce, its

operation affects interstate commerce under any of the other rationales mentioned in the mine safety cases.

Under the "ripple effect" analysis, it can be argued that defendant's intrastate operation is in competition with potential suppliers from outside the state. Defendant's customers might well be forced to purchase coal from sources outside Indiana if defendant did not supply them with coal. Thus, defendant's operation does affect commerce and is subject to the environmental controls of the Surface Mining Control and Reclamation Act.

This argument is particularly applicable once one considers the type of regulation involved. The goal of the Surface Mining Control and Reclamation Act is to insure proper environmental control of surface mining during operation of the mine and proper reclamation of the land. Such national standards need to be applicable to intrastate operations such as defendant in order to prevent unfair interstate competition. That is, if defendant is exempt from the Act's environmental controls, it can compete unfairly with would-be interstate coal suppliers who must perform the tasks required by the Act, such as performing costly reclamation, and thus must charge more for their coal. Interstate commerce and competition would be affected by the existence of such exempt mining operations. Thus, the Act must apply to the defendant in order to ensure no interference with the power to regulate interstate commerce.

Another rationale put forth in the mine safety cases also justifies the conclusion that defendant's mining operation affects interstate commerce. The cumulative effect of all intrastate surface mining operations certainly is of sufficient magnitude to affect interstate commerce. The combined amount of coal supplied by intrastate operations is large enough to make a significant impact on national commerce. Improper operation of a surface mine or improper reclamation of the land can result in the destruction of the land and surrounding countryside. Such destruction can result in loss of farmland and displacement of people. Such destruction, especially the cumulative amount of destruction and displacement that could result from all intrastate surface mining operations, certainly has an effect on interstate commerce.

While both the "rippling effect" analysis and "cumulative effect" rationale can be applied in this case to find that the defendant's operation affects interstate commerce and thus is subject to the Act, a third approach is available to demonstrate that the commerce power of the federal government and hence the Surface Mining Control and Reclamation Act extends to P-Burg Coal Company, Inc.

The purpose of the Act is to insure proper operation and reclamation of surface mining operations. The Act is designed to prevent environmental damage that can occur as a result of surface or strip mining. Bad drainage or improper reclamation can result in stagnant or acid runoff and pools. This runoff flows into nearby creeks and underground streams which in turn flow into other waterways. This type of pollution which the Act is designed to prevent ignores state lines. The pollution enters interstate commerce. Thus, defendant's operation is subject to the Surface Mining Control and Reclamation Act because the kind of environmental harm that can result from improper operation and reclamation by defendant crosses state lines and is not simply an intrastate problem.

While the Surface Mining Control and Reclamation Act applies to defendant's mining operation, it still must be determined whether the Interior Department must obtain a warrant before inspecting a surface mining operation as authorized by the Act. The beginning point of any discussion of the issue of the validity of warrantless searches is *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

In *Marshall v. Barlow's* the Supreme Court invalidated warrantless OSHA inspections. The Court reaffirmed the principle that the Fourth Amendment applies to commercial buildings as well as private

homes, pointing to the holding of *Camara v. Municipal Court*, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967), that warrantless searches of commercial premises are generally unreasonable. While an exception to this general rule was created in *United States v. Biswell*, 406 U.S. 311, 315–317, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1970), and *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 74–77, 90 S.Ct. 774, 774–777, 25 L.Ed.2d 60 (1970) for pervasively regulated industries, the Court emphasized that it was a narrow exception applicable only to industries with such a history of regulation that a businessman in such an industry has no reasonable expectation of privacy. The Court explained:

> "The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware." 436 U.S. at 312, 98 S.Ct. at 1821.

With regard to the validity of warrantless OSHA searches of all businesses, the Court reasoned that the imposition of minimum wage laws and other labor standards did not constitute the type of close regulation envisioned in *Biswell, supra,* to justify warrantless searches.

The Court noted that requiring a warrant would not render inspections ineffective since most businessmen would not object to a search. Moreover, delay in inspecting was apparently not a crucial problem since one of the regulations themselves provided for an inspector, upon being refused entry, to report the refusal to his superior who would take action, including filing suit. Thus, the regulations themselves offered a process involving some delay.

The Court concluded by cautioning that its holding did not mean that warrantless search provisions in any regulatory schemes were constitutionally infirm. The reasonableness of a warrantless search provision "will depend upon the specific enforcement needs and privacy guarantees of each statute." 436 U.S. at 321, 98 S.Ct. at 1825.

It is the task of this Court to apply the reasoning of *Marshall v. Barlow's, supra,* to the use of warrantless searches under the Surface Mining Control and Reclamation Act. If such warrantless searches are constitutionally permissible, then plaintiff's motion for a preliminary injunction must be granted along with the ultimate relief of a permanent injunction to the same effect.

Several cases have dealt with the issue of warrantless searches under the Coal Mine Health and Safety Act of 1969. In *Youghiogheny and Ohio Coal Co. v. Mortion*, 364 F.Supp. 45 (S.D.Ohio 1973), the court held that such warrantless inspections were constitutional. Noting the *Biswell-Colonnade* exception to the warrant requirement for pervasively regulated industries, the court found the coal industry to be an historically regulated industry. The court found the warrantless intrusions to be reasonable. The health and safety of miners were at stake, and Congress could reasonably conclude that unannounced inspections were necessary for effective regulation of safe mine conditions.

In *Marshall v. Donofrio*, 465 F.Supp. 838 (E.D.Pa.1978), the court upheld warrantless searches under the Coal Mine Health and Safety Act. The court stated that a balancing of various factors is necessary to determine if a warrant is required for a search of commercial premises. The court listed those factors:

> ". . . the urgency of the federal interest furthered by the regulatory scheme, the possibility that the warrant requirement might impair the effectiveness of that scheme, the possibility of abuse of that power to conduct warrantless searches, and the threat of a warrantless search to a businessman's justifiable expectation of privacy." At 841.

Applying these factors, the court found that the coal mine industry had a history of safety regulation sufficiently extensive so that anyone entering the coal mining business would be aware of such regulation and "would have little justifiable expectation of privacy with respect to safety regulation." At 842. The court noted that the power to conduct warrantless inspections under the act were less likely to be abused than an

OSHA inspection because the act specifically states the purpose and frequency of such inspections. The court reasoned that the governmental interest in the health and safety of miners is large, and the court believed that a warrant requirement with its attendant delay would hamper inspection efforts. The combination of these factors made warrantless searches under the act constitutional.

Three cases upheld warrantless searches under the 1977 Mine Safety and Health Amendments Act which extended safety regulations to all mineral extraction industries. The reasoning in each case is similar. The courts all emphasized the fact that the warrantless search provisions were narrowly drawn to prevent abuse, the fact that surprise was necessary for effective inspection and that delay caused by obtaining a warrant would hamper inspection efforts, and the fact that there was a long history of safety regulation in the mining industry and thus the requirements of the pervasively regulated exception to the warrant requirement were met. See *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, (3 Cir. 1979), cert. den. 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Marshall v. Nolichuckey Sand Co., Inc.*, 606 F.2d 693 (6 Cir. 1979), cert. den. —— U.S. ——, 100 S.Ct. 1835, 64 L.Ed.2d 261; *Marshall v. Sink*, 614 F.2d 37, 48 L.W. 2541 (4 Cir. 1980).

It must be noted that all of these cases upholding warrantless searches dealt with safety regulations of the mining industry. Each case found the mining industry pervasively regulated with respect to safety regulations. The only case that deals with warrantless searches under the Surface Mining Control and Reclamation Act of 1977 is *In Re Surface Mining Regulation Litigation*, 456 F.Supp. 1301 (D.D.C.1978).

In *In Re Surface Mining Regulation Litigation, supra,* the court upheld warrantless searches under the Surface Mining Control and Reclamation Act, reasoning that surface mining fell within the pervasively regulated business exception to the warrant requirement. The court noted that the coal industry had a long history of regulation beginning with the creation of the Bureau of Mines in 1910.

The court acknowledged that the Surface Mining Control and Reclamation Act dealt with environmental control rather than mine safety which had been the subject of previous mine regulations, but the difference was deemed irrelevant to the finding that the coal industry was pervasively regulated. The Surface Mining Control and Reclamation Act was like the previous regulatory statutes in that its concern was public health and safety.

The court also found that the warrantless search provisions were reasonable and limited. Moreover, the court was impressed by the need for surprise searches to ensure compliance. The warrantless search provisions were held constitutional.

From this review of cases, it is clear that while the Fourth Amendment extends to commercial buildings and premises, there is an exception to the warrant requirement. The exception applies to pervasively regulated industries. The mining industry is a pervasively regulated industry. As pointed out by all of the courts that have considered the Coal Mine Health and Safety Act, there is a long history of safety regulation of the mining industry. This kind of long regulation of a particular industry is the type of specific, historic federal oversight that eliminates the expectation of privacy someone usually has when one enters a business. Federal regulation is recognized as part of doing business in such a field. The environmental controls, while not concerned with worker safety as was past regulation, are nevertheless properly viewed as a continuation of historic federal concern for proper management of mining operations, as is the case with safety regulation. The Surface Mining Control and Reclamation Act is designed to prevent the desire for profit from resulting in polluted waterways and inadequate reclamation. The conflict is the same—profits versus health and safety. The only difference is that the Surface Mining Control and Reclamation Act is directed not just at worker health and safety but all

those living on or near reclaimed land and all those living by streams or waterways which could be polluted by said run-off. In an industry long accustomed to federal regulation, this difference is only one of degree, not of kind. The mining industry fits the exception for pervasively regulated industries with regard to the Surface Mining Control and Reclamation Act of 1977.

It should also be noted that the regulations describing the power of warrantless inspections under the Act describe the basis for an inspection. Inspections must occur at least once every six months. The area to be inspected includes any mining and reclamation operation as well as any premises in which required records are kept. Access to such records is limited to reasonable hours. 30 CFR §§ 721.11, 721.12. These guidelines are similar to the guidelines for inspection under the Coal Mine Health and Safety Act which were found to be sufficiently specific to do away with the need for a warrant. The Surface Mining Control and Reclamation Act and accompanying regulations adequately describe the scope of the inspections such that the delimiting function of an administrative search warrant is unnecessary.

Administrative search warrants require a lesser showing of probable cause before inspection. Such warrants can best be described as a way to check abuse of the inspection power, to prevent frequent searches designed to harass. The guidelines for inspections found in the regulations provide such a check on such extreme abuse of the power to conduct warrantless searches.

In addition to the guidelines for inspections, the Act provides that upon a refusal to permit an inspection, the government is to institute an action enjoining the defendant coal company from preventing such inspection. 30 U.S.C. § 1272(c). Such a provision gives a coal company the necessary vehicle to ensure that the guidelines for inspections are followed. Such a provision also provides protection for any justifiable privacy interest which a particular coal company may have. By requiring the government to seek an injunction upon refusal to allow an inspection, the Act gives a coal company the protection of the court against harassment or undue searches. Whenever the coal company feels that there is a need for an impartial third body to decide on the need and legitimacy of a government search of a surface mining operation, such protection is available.

Given the long history of federal regulation of the mining industry, along with the guidelines for inspection and the provision requiring the government to seek injunctive relief upon refusal to allow inspection, the government is not required to obtain a search warrant before being able to inspect the defendant's mining operation. Since warrantless inspections under the Surface Mining Control and Reclamation Act of 1977 are constitutionally permissible and since defendant has raised no other objection to the government's inspection besides the lack of a warrant, the government's request for a preliminary injunction is granted. Defendant and any of its officers or agents are enjoined from refusing to allow plaintiff's representatives onto defendant's mining operation in order to conduct inspections called for by the Surface Mining Control and Reclamation Act of 1977 on the ground that a warrant is required. Pursuant to Rule 65(a)(2), F.R. Civ.P., trial of the action on the merits is advanced, and a permanent injunction to the same effect is also granted.