Kathleen RUSH, Eleanor Fraser, San Mateo County Daycare Association, Plaintiffs,

v.

Mario OBLEDO, Secretary, California Health and Welfare Agency; Marion J. Woods, Director, Department of Social Services; Ann Bersinger, Deputy Director Community Care Licensing, Department of Social Services; Gary L. Baysmore, Unit Supervisor, Licensing and Certification Division, Department of Social Services; Tony Lee, Social Worker, Department of Social Services; Jesus Longorio, Social Worker, Department of Social Services, Defendants.

No. C–79–2256–MHP.

United States District Court, N. D. California.

May 18, 1981.

Charles B. Klinedinst, Barry Murphy, John Kelson, Pettit & Martin, San Francisco, Cal., for plaintiffs; Marsha Rosen, Lawyers for Urban Affairs, Lujuana Wolfe Treadwell, Bay Area Child Care, San Francisco, Cal., of counsel.

George Deukmejian, Atty. Gen. of Cal., Stephanie Wald, Deputy Atty. Gen., San Francisco, Cal., for defendants.

## OPINION

PATEL, District Judge.

■ This case raises the question whether the California state statutes and regulations permitting warrantless inspection of family day care homes violate the Fourth Amendment to the United States Constitution. The parties agree that there are no disputes as to material facts. The case is therefore before the court on cross-motions for summary judgment.

## FACTUAL BACKGROUND

The pertinent facts are stipulated or uncontroverted. Plaintiffs are: an operator of a licensed family day care home in San Mateo County, California[1]; and an association of licensed family day care providers in

---

1. Two such persons were originally named as plaintiffs, but one has ceased to operate in California and has been dismissed voluntarily from the action.

the same county. "A family day care home is generally defined as a private home in which regular care is given to 6 or fewer children, including the caregiver's own, for any part of a 24-hour day."[2] Family day care homes are very different from institutional day care centers. They are private residences in which a provider cares for a small number of children, often the children of neighbors or acquaintances.[3] Under California law, operating a family day care home for six or fewer children (plus any resident children) is considered a residential use of property, and the home *may not* be treated differently from other single-family dwellings for local zoning, building or safety code purposes. Cal.Health & Safety Code § 1529.5.

A California statute authorizes unannounced warrantless inspections of family day care homes at any time. Cal.Health & Safety Code § 1533. The implementing regulation limits inspections to the hours of operation of the home; it also provides that refusal to admit the inspector shall constitute cause for revocation or suspension of the home's license. 22 Cal.Admin.Code § 86025. The parties have stipulated that the state's policy is to conduct inspections of family day care homes without notice.[4] Inspections are conducted at least once every two years. *See* Cal.Health & Safety Code § 1528(a). It is also stipulated that the state draws no policy distinction for this purpose between family day care homes and other community care facilities such as nursing homes or large institutional day care centers.

Finally, the state apparently takes the position that the statute authorizes warrantless inspection of unlicensed as well as licensed homes. Certainly, the statute is not by its terms limited in application to licensed facilities; it authorizes inspection of "*any place* providing personal care, supervision and services." Cal.Health & Safety Code § 1533 (emphasis added).[5]

Plaintiffs brought this action seeking a declaratory judgment that Health & Safety Code § 1533 and the implementing regulations are unconstitutional, at least as applied to family day care homes, and an injunction against further warrantless inspections under these provisions.

## DISCUSSION

 The circumstances in which agents of the state can enter private property

2. Day Care Div., Admin. for Children, Youth & Families, Office of Human Devel. Serv., Dep't of Health & Human Serv., Family Day Care in the United States: Family Day Care Systems in n.* (1980) (vol. 5 of the Final Report of the National Day Care Home Study, made a part of the record in this action by stipulation; hereinafter "Family Day Care Study"). As stipulated by the parties for the purposes of this action, a family day care home is "a personal residence in which a licensed or unlicensed caregiver regularly provides care, protection and supervision to a child or children for a period of less than 24 hours a day," and in which formal instruction or schooling is not part of the caregiver's function. The regulatory definition, 22 Cal.Admin.Code § 86001(a), is broad enough to encompass any *regularly occurring*, paid babysitting in the babysitter's own home, no matter how few children are cared for or how few hours a week are involved, unless the children are related to the caregiver. *See id.* § 86003. California law apparently permits a family day care home to care for up to 12 children, but a home with more than six children must employ an assistant caregiver. *See* 22 Cal.Admin.Code § 86029.

3. Family Day Care Study at iii. Family day care is not a highly profitable enterprise. In California in 1978, family day care providers affiliated with "systems" (private umbrella agencies supplying technical assistance and referrals) earned an average of about $5,800 per year exclusive of fringe benefits. The vast majority of these providers were below the 1977 poverty line. Moreover, these system-affiliated providers tend to earn more than their independent counterparts. *Id.* at 86–87.

4. *See* Evaluator's Manual §§ 5–3100, 5–5200 (Exhibit B to Defendants' Cross-Motion, Attachment 1, at 2, 5) (site visits to licensed facilities "shall be unannounced," with some exceptions).

5. The regulations provide for a "site visit" to determine whether an unlicensed home is being operated. 22 Cal.Admin.Code § 86005(a)(1). This regulation does not appear to require notice or a warrant before the "site visit." Defendants' exhibits include an affidavit describing an instance of an unannounced, warrantless entry into a suspected unlicensed facility. Exhibit J to Defendants' Cross-Motion, Affidavit of Jose Olveda, at 2.

without a warrant are limited by the Fourth Amendment, even when the entry is for administrative inspection rather than a criminal search. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In this case, to justify its policy of warrantless entry into family day care homes, the state relies on the "closely regulated industry" exception to the warrant requirement for administrative searches. *See generally Marshall v. Wait*, 628 F.2d 1255 (9th Cir. 1980). Alternatively, the state relies on a general "reasonableness" argument that, on balance, the state's interest in protecting the welfare of the children in care justifies warrantless inspections, especially given that family day care licensees are put on notice that such inspections will occur. *Cf. Marshall v. Barlow's, Inc.*, 436 U.S. at 315–16, 321, 98 S.Ct. at 1821–22 (reasonableness of warrantless searches in future cases will depend on specific enforcement needs and privacy guarantees in particular factual settings).

## I

### Closely Regulated Industry Exception

The "closely regulated industry" exception to the warrant requirement derives from *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), and *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). In *Colonnade*, federal agents broke into a locked storeroom in order to seize liquor from a catering establishment that operated under state and federal liquor licenses. A federal statute imposed a fine for refusal to allow inspectors to enter the premises of dealers such as Colonnade. The Supreme Court upheld the validity of the statute because of the long history of regulation of the liquor industry, pointing out that liquor laws existed in England as early as 1661, in colonial America in 1691, and in federal legislation as of 1791. The Court went on to hold that Congress had not intended the statute to authorize forcible entries, and ordered the evidence suppressed.

In *Biswell*, the Court upheld against a Fourth Amendment challenge a statute, similar to the one at issue in *Colonnade*, that authorized inspection during business hours of the premises of gun dealers. The Court acknowledged that federal regulation of firearms did not have as long a history as that of liquor. But the Court stressed the vital crime-fighting importance of the gun control statutes, and the crucial role played in the statutory scheme by unannounced, frequent inspections flexible in time and scope. Finally, the Court noted that the inspections posed only limited threats to any justifiable expectation of privacy, because "[w]hen a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms and ammunition will be subject to effective inspection." 406 U.S. at 316, 92 S.Ct. at 1596. The Court concluded that "where ... regulatory inspections further urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive dimensions," a statutory warrantless inspection does not violate the Fourth Amendment. *Id.* at 317, 92 S.Ct. at 1597.

The *Colonnade/Biswell* doctrine is not without limits, however. In *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), a federal statute authorized warrantless inspections of the work areas of any employment facility subject to the broad jurisdictional provisions of the Occupational Safety and Health Act of 1970 (OSHA). The president of Barlow's, Inc. refused to allow an OSHA inspector to conduct a random warrantless inspection of his business, and sued to enjoin enforcement of the statute.

The Supreme Court invalidated the OSHA statute insofar as it purported to permit warrantless inspections. In so doing, the Court declined to apply the "closely regulated industry" exception to all industries within the reach of OSHA. The Court characterized the cases that had formulated the exception as "responses to relatively unique circumstances" existing in particular

industries with "such a history of government oversight that no reasonable expectation of privacy ... could exist for a proprietor over the stock of such an enterprise." 436 U.S. at 313, 98 S.Ct. at 1821. "[W]hen an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation." *Ibid.* The Court stressed that closely regulated industries are the exception, not the rule. *Ibid.*

■ Under this standard, family day care is not a closely regulated industry, either nationally or in California. "For the most part family day care in this country is provided in the homes of *unregulated* caregivers who operate informally, independent of any regulatory system or administrative structure." Family Day Care Study at ii (emphasis in original). In 1976 to 1977, it was estimated that there were only about 111,000 regulated family day care homes in the nation, compared to over a million unregulated homes. *Id.* at 1. As of 1971, regulations governing family day care homes were on the books in 48 states, yet it was estimated at the same time that up to 90% of such homes were operating in an unregulated manner. *Compare id.* at 12 *with id.* at ii. Thus, family day care, an industry perhaps as ancient as any known to humanity, was overwhelmingly unregulated as recently as ten years ago.

Of all the states, California does have perhaps the longest and most consistent history of state involvement in day care, including family day care. *See id.* at 2; Exhibit A to Defendants' Cross-Motion; former Cal.Welf. & Inst.Code § 1620(a) (enacted by 1937 Cal.Stats. ch. 369 at 1076–77; repealed 1965; current version at Cal. Health & Safety Code §§ 1253, 1508). Yet even today in California, regulation of family day care homes is not pervasive or all-encompassing. A license is required,[6] but the qualifications to obtain such a license are minimal—essentially, anyone in good health who does not have a criminal record (or household residents with criminal records) can qualify. *See* 22 Cal.Admin.Code §§ 86009–86015. A fire safety clearance must be obtained if more than six children will be cared for. *Id.* §§ 86015, 86031. Licensing reviews are limited by statute to health and safety considerations, and do not include evaluation of the quality of care or of any education or training offered by the caregiver. Cal.Health & Safety Code § 1528. The regulations provide that the license shall be posted, limit the capacity of a home, and contain a brief list of basic safety standards, most of which ought to be followed as a matter of course in any well run home where children are present: fireplaces must be screened, hazardous objects and substances secured, pools fenced, and so on. Cal.Admin.Code §§ 86021, 86029, 86033. No limit is placed on hours of operation or activities; no special equipment other than a few toys and in certain circumstances a highchair is required.

To bring an industry subject to such minimal substantive regulation within the scope of the "closely regulated industry" exception to the warrant requirement would be to ignore reality and stretch the exception to cover the rule. Family day care has neither the long history of regulation relied on in *Colonnade*, nor the pervasive regulation and limited threat to privacy from warrantless inspections that were present in *Biswell*.

Of all the industries that courts have found since the *Barlow's, Inc.* decision to be within the closely regulated industry exception, the only one that even remotely resembles family day care is that of licensed

---

6. As an experimental alternative to licensing of family day care homes (but no other community care facilities), the California Legislature in 1979 added a provision for a pilot program in three counties whereby homes would be registered rather than licensed. Cal.Health & Safe-

ty Code § 1528.5 (enacted by 1979 Cal.Stats. ch. 1063, § 4). The difference is that under licensing, agents of the state visit the home to ensure that applicable standards are met; under registration, the day care provider certifies

**910**

skilled nursing facilities.[7] In *People v. Firstenberg*, 92 Cal.App.3d 570, 155 Cal.Rptr. 80 (2d Dist. 1979), defendant had been convicted of misusing personal funds of patients in his facility. Some of the evidence supporting the violation was obtained when a county health inspector made a warrantless site visit to defendant's facility and examined its records. Defendant argued that this evidence had been obtained illegally, citing *Marshall v. Barlow's, Inc.* Relying both on the important state interest in

---

compliance to the state. *See* Family Day Care Study at 23 n.*.

**7.** Post-*Barlow's* cases have upheld warrantless administrative searches, at least with some limitations, in the following contexts: commercial fishing, *United States v. Raub*, 637 F.2d 1205 (9th Cir. 1980); *United States v. Kaiyo Maru No. 53*, 503 F.Supp. 1075, 1084–86 (D.Alaska 1980); *United States v. Tsuda Maru*, 470 F.Supp. 1223, 1229 (D.Alaska 1979); *State v. Mach*, 23 Wash.App. 113, 594 P.2d 1361 (1979); shipping, *United States v. Espinosa-Cerpa*, 630 F.2d 328, 333–34 (5th Cir. 1980); *United States v. Hilton*, 619 F.2d 127, 132–33 (1st Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980); *United States v. Harper*, 617 F.2d 35 (4th Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980) (dictum); pleasure boating, *United States v. Whitmire*, 595 F.2d 1303, 1312–13 & n.22 (5th Cir. 1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980); *but cf. United States v. Piner*, 608 F.2d 358 (9th Cir. 1979) (Coast Guard's warrantless safety inspections of small pleasure vessels must be limited to daylight hours unless there is articulable cause for nighttime boarding); water pollution-related activities, *In re State Dep't of Envir. Protec.*, 177 N.J.Super. 304, 426 A.2d 534 (N.J.Super., App.Div.1981); food and drug dealers, *United States v. Schiffman*, 572 F.2d 1137 (5th Cir. 1978); *United States v. New England Grocers Supply Co.*, 488 F.Supp. 230, 238 (D.Mass. 1980); *United States v. Hartley*, 486 F.Supp. 1348 (M.D.Fla.1980) (government contractor supplying food to military); *Hosto v. Brickell*, 265 Ark. 147, 577 S.W.2d 401 (1979); mining and mineral extraction, *Marshall v. Sink*, 614 F.2d 37 (4th Cir. 1980) (small coal mine); *Marshall v. Texoline Co.*, 612 F.2d 935 (5th Cir. 1980) (open pit gravel mine); *Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693 (6th Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980) (sand and gravel pit); *Marshall v. Stoudt's Ferry Prep. Co.*, 602 F.2d 589 (3d Cir. 1979), *cert. denied*, 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980) (plant separating burnable coal residue out of material dredged from riverbed); *Andrus v. P-Burg Coal Co.*, 495 F.Supp. 82 (S.D.Ind.1980) (surface coal mine); *Marshall v. Donofrio*, 465 F.Supp. 838 (E.D.Pa.1978), *aff'd mem.* 605 F.2d 1194, 1196 (3d Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980) (coal mine); *In re Surface Mining Regulation Litigation*, 456 F.Supp. 1301, 1318 (D.D.C.1978), *aff'd in part, rev'd in part on other grounds*, 627 F.2d 1346 (D.C. Cir. 1980) (surface coal mines); *Marshall v. Cedar Lake Sand & Gravel Co.*, 480 F.Supp. 171 (E.D.Wis.1979) (sand and gravel pit); *see also Youghiogheny & Ohio Coal Co. v. Morton*, 364 F.Supp. 45 (S.D.Ohio 1973) (coal mines; pre-*Barlow's*); *but cf. Marshall v. Wait*, 628 F.2d 1255 (9th Cir. 1980) (family-operated decorative rock quarry); *Marshall v. Dewey*, 493 F.Supp. 963 (E.D.Wis.1980), *prob. juris. noted*, 449 U.S. 1122, 101 S.Ct. 937, 67 L.Ed.2d 108 (1981) (stone quarry); *Virginia Surface Mining & Reclam. Assoc., Inc. v. Andrus*, 483 F.Supp. 425, 442 n.18 (W.D.Va.) (dictum), *prob. juris. noted*, 449 U.S. 817, 101 S.Ct. 67, 66 L.Ed.2d 19 (1980) (surface coal mines); licensed automobile dismantlers, used parts dealers, and mobile dismantlers, used parts dealers, and second-hand goods dealers, *People v. Woolsey*, 90 Cal.App.3d 994, 1001–04, 153 Cal.Rptr. 746, 749–51 (4th Dist. 1979); *People v. Easley*, 90 Cal.App.3d 440, 444–45, 153 Cal.Rptr. 396, 399 (2d Dist.), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979); *State v. Barnett*, 389 So.2d 352 (La.1980); *People v. Tinneny*, 99 Misc.2d 962, 417 N.Y.S.2d 840, 845–46 (1979); *but cf. State v. Galio*, 92 N.M. 266, 587 P.2d 44 (Ct.App.), *cert. denied*, 92 N.M. 260, 586 P.2d 1089 (1978) (auto diagnostic and repair clinic); taverns, *State v. Williams*, 84 N.J. 217, 417 A.2d 1046, 1048–50 (1980) (dictum) (administrative inspections by alcoholic beverage control officials are constitutional, but warrantless search by police looking for evidence of crime and not acting with authorization of alcohol board was not constitutional); and massage parlors, *Pollard v. Cockrell*, 578 F.2d 1002, 1014 (5th Cir. 1978).

Courts have struck down warrantless administrative inspections in the following contexts: trucking, *United States v. Shaefer*, 637 F.2d 200 (3d Cir. 1980); residential real estate, *Hometown Co-Op. Apts. v. City of Hometown*, 495 F.Supp. 55 (N.D.Ill.1980) (point-of-sale inspection); adult book stores, *State v. Huddleston*, 412 A.2d 1148, 1156–57 (Del.Super.Ct.1980); and physicians' offices or clinics, *Margaret S. v. Edwards*, 488 F.Supp. 181, 214–17 (E.D.La. 1980); *Hawaii Psychiatric Society v. Ariyoshi*, 481 F.Supp. 1028, 1045–50 (D.Hawaii 1979). Insofar as these cases fall into any discernible pattern, this court is of the opinion that family day care homes are more like the contexts in which warrantless inspections have been struck down than they are like those in which such inspections have been upheld.

protecting helpless nursing home patients, and on the lowered expectation of privacy to which the owner of a licensed, heavily regulated business is entitled, the court held that the warrantless inspection was reasonable, and affirmed the denial of defendant's motion to suppress.

This court is not bound by *People v. Firstenberg*, a California state court's interpretation of federal law. Nor is it necessary to consider the soundness of its conclusions. Even if the analysis in *Firstenberg* is correct, it is factually and legally distinguishable from the family day care situation.

*Firstenberg* relied in part on the longstanding heavily regulated nature of institutions giving medical care to the aged and infirm, and on the fact that skilled nursing homes are part of the health care industry, a pervasively regulated field that also includes hospitals and similar institutions. *See People v. Firstenberg*, 92 Cal.App.3d at 579–81, 155 Cal.Rptr. 80. The regulation of *health* care, as opposed to part-time *custodial* care of well children, has a somewhat longer history and is far more extensive. *See id.* at 579 & n.5, 155 Cal.Rptr. 80.[8] The regulations governing skilled nursing facilities occupy almost 100 pages of the California Administrative Code. 22 Cal.Admin. Code §§ 72001–72727. They contain detailed requirements for staffing levels, staff training, and staff qualifications. *E. g.*, 22 Cal.Admin.Code §§ 72322(e), (i), (j), 72323, 72389(d). The regulations mandate a wide range of services, *id.* §§ 72301, 72309, 72329, 72381–93, and equipment, much of it highly specialized, *id.* §§ 72307, 72325, 72351–79, 72619, 72623, 72629, 72631, 72637. Violations of the regulations are divided into three classes of seriousness, with corresponding differences in treatment. *Id.* §§ 72701–09. Construction plans for new or altered facilities must first be approved. *Id.* §§ 72207, 72213, 72603. All local safety codes and similar regulations must be complied with, and seismic safety standards observed. *Id.* § 72213. Written policies and organizational charts must be developed. *Id.* §§ 72321, 72519, 72521, 72523. Food served must meet federal nutritional standards, *id.* § 72329, and food storage and kitchen hygiene requirements are set forth in great detail, *id.* §§ 72341–45, 72349. The regulations cover such minutiae as required identification badges for employees, *id.* § 72529; permissible containers or equipment for serving milk, *id.* § 72349(b)(4); required temperature ranges for nursing station refrigerators, *id.* § 72623; minimum lighting levels in different areas, *id.* § 72649, and the required daily changing of replaceable mop heads, *id.* § 72673(c)(3).

8. Regulation of the parttime care of well children began in California in 1937, when day nurseries for children were added to a class of facilities, such as boarding houses for the aged, that had been subject to licensing and regulation since 1925. 1937 Cal.Stats. ch. 369 (amending and recodifying statutes derived from 1925 Cal.Stats. ch. 18, § 1). The 1937 statutory scheme was recodified several times, but retained essentially the same substance until 1973, when it was replaced by the California Community Care Facilities Act, 1973 Cal.Stats. ch. 1203 § 4. *See* 1965 Cal.Stats. ch. 1784; 1972 Cal.Stats. ch. 1148 § 13. In 1975, day care facilities for children were placed in a separate, somewhat less heavily regulated subcategory within the Community Care Facilities Act, and the statutory scheme took the essential form it has retained to date. *See* 1975 Cal.Stats. ch. 102, § 1. In 1979, a further move toward deregulation occurred with the institution of a pilot program of registration rather than licensing, and restriction of cease and desist orders directed at unlicensed homes to situations involving danger to children's health and safety. 1979 Cal.Stats. ch. 1063, §§ 3, 4.

The statutory scheme at issue in the *Firstenberg* case ultimately derives from the same 1925 statute governing boarding houses for the aged that was extended to cover parttime child care in 1937. *See* 1925 Cal.Stats. ch. 18. But in 1945, while regulation of child day care remained substantively minimal, *see* Exhibit A to Defendants' Cross-Motion, nursing homes were placed in the same statutory category as fullfledged acute care hospitals. 1945 Cal.Stats. ch. 1418 § 3. Currently, skilled nursing homes are governed by applicable portions of the general statutory scheme regulating health care facilities (including acute care hospitals), Cal. Health & Safety Code §§ 1250–1339.50, and by the Long-Term Care, Health, Safety and Security Act of 1973, Cal.Health & Safety Code §§ 1417–39 (added by 1973 Cal.Stats. ch. 1057, § 1). They must be inspected without notice at least twice a year and promptly whenever a bona fide complaint is filed. Cal.Health & Safety Code §§ 1419–22.

Family day care homes, on the other hand, not only are classed as "community care facilities," a less heavily regulated category than health care facilities, but also are exempt from many of the regulations governing other community care facilities. 22 Cal.Admin.Code § 86007; *compare* Cal. Health & Safety Code §§ 1528(a), 1529 *with id.* § 1524 (family day care home licenses valid for two years; licenses for other community care facilities valid for one year initially, two years upon renewal only if no violations). Instead, they are governed by a separate regulatory scheme comprising only about twelve pages and, as already noted, minimal in substantive content. 22 Cal.Admin.Code §§ 86001–86039.[9] The degree of regulation simply is not comparable.

■ Even if family day care is not a closely regulated industry, *Marshall v. Barlow's, Inc.*, 436 U.S. at 315–16, 321, 98 S.Ct. at 1824, leaves open the possibility that warrantless administrative searches of family day care homes may be found to be "reasonable" under the Fourth Amendment. Defendants in this case urge the court to so hold. For the reasons explained below, however, the "reasonableness" argument fails also.

## II

### Reasonableness of Warrantless Searches of Family Day Care Homes

■ The "reasonableness" analysis in *Marshall v. Barlow's, Inc.* contemplates a balancing between the governmental interest served by warrantless searches, and the privacy interest of the owner of the business being inspected. In the context of family day care, the state has a strong and important interest in protecting, via inspection, the health and welfare of the children in care. Children are entitled to special

protection and solicitude from the state; enforcing standards of quality in extra-familial child care is a legitimate and indeed laudable goal of state regulation. The caregiver's privacy interest in a "business" that takes place in her own private residence is also exceptionally strong, however. "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). In drawing a balance between these interests, this court does not intend in any way to denigrate the importance of either.

### A. The Caregiver's Privacy Interest.

■ It is a basic principle of Fourth Amendment law that searches inside a home without a warrant are presumptively unreasonable. *Payton . v. New York*, 445 U.S. at 586, 100 S.Ct. at 1380. Surely the state has as great an interest in arresting those who are believed to have committed serious, violent crimes as it does in ensuring the health and safety of children in family day care homes. Yet the United States Supreme Court held unequivocally in *Payton v. New York* that a warrant is required to effectuate such an arrest in the suspect's home, absent one of the traditional exceptions to the warrant requirement. *Id.* at 590, 602–03, 100 S.Ct. at 1382, 1388.

Moreover, in *Marshall v. Barlow's, Inc.*, 436 U.S. at 320–21, 98 S.Ct. at 1824, the Court held that because of the generally noncriminal nature and consequences of a federal OSHA violation, warrants for federal OSHA inspections need only be based on reasonable administrative standards, not on the kind of probable cause needed for criminal search warrants.[10] On the other hand,

---

**9.** Of course, the number of pages of regulations is only a very crude indicator of the extent to which an industry is regulated. But the vast disparity in this respect between the industry at issue in *Firstenberg* and the family day care industry illustrates the historical and present differences between the two situations with respect to degree of regulation.

**10.** This holding relied on the Court's earlier decisions in *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

in *Salwasser Manufacturing Co. v. Municipal Court*, 94 Cal.App.3d 223, 231–33, 156 Cal.Rptr. 292 (5th Dist. 1979), because of the criminal nature and greater penal consequences of a violation of California's state OSHA law, the court held that warrants for California OSHA inspections must be based on probable cause. As *Salwasser* points out, it is clear from the relevant Supreme Court case law that the distinction is to be drawn based on the criminal or civil nature of the investigation and of the consequences of any violation.

■ The criminal penalties applicable to operators of community care facilities, including family day care homes, are set forth in § 1540 of the California Health and Safety Code, which reads as follows:

> Any person who violates any of the provisions of this chapter [Cal. Health & Safety Code §§ 1500–1567.9], or who willfully or repeatedly violates any rule or regulation promulgated under this chapter, is guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not to exceed five hundred dollars ($500) or by imprisonment in the county jail for a period not to exceed 180 days, or by both such fine and imprisonment.

Thus, operators of licensed homes face misdemeanor convictions if they are found to have willfully or repeatedly violated regulatory standards. Therefore, as in *Payton* and *Salwasser*, owners of family day care homes have a substantial interest in the protection of a neutral and detached magistrate that is afforded by requiring a warrant, and the state must meet a heavy burden in order to justify as "reasonable" the statute authorizing warrantless entry.

■ The state argues that at least during operating hours, and in the portions of the home where children are cared for, the family day care home is not a home but a business. However, the *Salwasser* case involved a business, and business premises are

not exempt from the protections of the Fourth Amendment. *See v. City of Seattle*, 387 U.S. 541, 543, 545–46, 87 S.Ct. 1737, 1740–41, 18 L.Ed.2d 943 (1967). And even if a family day care home is in some ways like a business, it is still one operated out of a private home. At the hearing on the summary judgment motions, defendants' counsel pointed to other community care facilities as examples of "businesses" that operate out of the home. Interestingly, in 1975 the California legislature added a section to the Community Care Facilities Act that expressly directs the government to "consider … as private residences," and regulate separately, 24-hour foster homes for six or fewer children. Cal. Health & Safety Code § 1530.5 (enacted by 1975 Cal. Stats. ch. 917, § 2, at 2024). In 1976, the legislature went even further, and added an explicit reference to "provisions for periodic inspections" as one of the respects in which such foster homes are to be considered private residences. 1976 Cal.Stats. ch. 969, § 2, at 2266 (codified at Cal. Health & Safety Code § 1530.5).[11] Also, as previously noted, a family day care home may not be treated as other than a private residence for zoning and building code purposes. Cal. Health & Safety Code § 1529.5. Thus, there is some indication that the California legislature itself does not consider that care and supervision of a few children in a family-like setting transforms a home into a business or diminishes the Fourth Amendment protection to which its occupants are entitled.

■ Finally, family day care is totally different in kind from other home-operated business (except foster homes and the like), and from skilled care facilities such as that involved in the *Firstenberg* case. Family day care will normally take place in the very same portions of the home normally used for family purposes, not in some spe-

---

11. Despite this statutory mandate, defendants' regulations governing inspections of small foster homes are substantially similar to regulations concerning inspection of other community care facilities, including family day care homes. *Compare* 22 Cal.Admin.Code § 85109 (foster homes may be inspected at any time without notice) *with id.* § 80351 (community care facilities generally may be inspected at any time without notice) *and id.* § 86025 (family day care homes may be inspected during operating hours without notice).

cial area separate from the caregiver's living quarters.[12] The routine activities of the family day care provider are indistinguishable from those of any parent caring for his or her own children at home. For all of these reasons, this court concludes that the protections afforded to a private home by the Fourth Amendment are in no way diminished by the fact that the occupant of the home is paid to care for a few children from other people's families part of the day.

## B. The Government's Interest in Conducting Warrantless Inspections.

Plaintiffs do not contest the defendants' strong interest in protecting the health and welfare of children in family day care homes. Nor does this court intend to give less than full recognition to the state's interest in ensuring the availability of high quality child care. But it is the warrantless inspections with which plaintiffs take issue, contending that they are not necessary in order to meet the government's needs. Plaintiffs argue that the family day care providers' strong privacy interest outweighs the defendants' interest in warrantless inspections.[13]

1. *Need for Surprise Inspections.* Much of defendants' support for the necessity of warrantless inspections comes from an asserted need for inspections *without notice.* The logic of this argument, however, glosses over the provisions of California law that allow administrative inspection warrants to be issued without notice, and even without a prior attempt to secure consent, if the facts and circumstances justify a surprise inspection. *See* Cal.Civ.Proc. Code §§ 1822.51, 1822.56. Given the strength of defendants' asserted interest in surprise inspections, they should be able to obtain a warrant easily under these provisions without giving advance notice, whenever circumstances so require. *See generally Payton v. New York,* 445 U.S. 573, 586 n.24, 100 S.Ct. 1371, 1380 n.24, 63 L.Ed.2d 639 (1980) (Fourth Amendment does not deny law enforcement the support of the usual inferences that reasonable people draw from evidence; it merely requires that those inferences be drawn by a neutral and detached magistrate). Therefore, arguments supporting defendants' need to conduct *surprise* inspections provide little, if any, support for their need to conduct *warrantless* inspections. *Cf. Marshall v. Barlow's, Inc.,* 436 U.S. 307, 319–20 & n.15, 98 S.Ct. 1816, 1823–24 & n.15, 56 L.Ed.2d 305 (1978) (dictum) (if OSHA regulations provided for ex parte issuance of warrants, then warrant requirement would not interfere with need for surprise inspections).[14]

---

12. The regulations specifically contemplate the use of family bedrooms for naps, 22 Cal.Admin. Code § 86033(d), use of the refrigerator (and presumably the kitchen) for meals and snacks, *id.* § 86033(j), and use of the yard, if any, for play, *id.* § 86033(e)(6).

13. The defendants argue that the family day care provider has no reasonable expectation of privacy from warrantless inspections because the providers are told during the license application process that such inspections will be conducted. *See United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). This begs the question. The inspections can be conducted only because of the authority given by the very statute and regulations whose validity is in issue here. If these provisions conflict with the Fourth Amendment, the state cannot resolve the conflict merely by announcing ahead of time to those affected that a search will be conducted. Prior notice of the authority to inspect was only one of several factors used in *Biswell* to establish the applicability of the closely regulated indus-

try exception. *Id.* at 315–17, 92 S.Ct. at 1596–97. It is not determinative in and of itself. Otherwise, the OSHA provision invalidated in *Marshall v. Barlow's, Inc.* would have been valid as applied to any business whose proprietor knew of the statute before beginning to do business.

14. Furthermore, the state's need for surprise inspections may not be as pressing as counsel would have us believe. Surprise inspections may be of some help in discovering conditions of overcrowding and poor supervision, but (as discussed below) these are also among the conditions most likely to be observable without entry into the home. Dangerous or unsanitary conditions such as improperly secured toxic chemicals are not likely to be evidenced outside the home. However, if they are cleaned up in response to advance notice of a forthcoming inspection, this merely means that the ultimate purpose of the inspection—correction of the violation—is accomplished before it takes place. Insofar as the state's goal is detection

2. *Inability to Obtain Evidence to Support Warrant.* Defendants also argue that the hazards from which children in family day care homes must be protected are not evident from outside the home, and thus that they must be able to conduct routine inspections in order that such violations will not escape their attention. However, the uncontroverted facts submitted by defendants themselves in support of their motion for summary judgment do not support this contention.

First, the stipulation of facts provides that during almost four years of unannounced visits to family day care homes by defendant Longorio, he was refused admittance to the home on only two occasions. Affidavits of other inspectors (Exhibits F through M to Defendants' Cross-Motion) enumerate some 13 instances of inspections that revealed violations. (The affidavits do not indicate how many inspections were performed in which no violations were detected.) In only two of these instances was entry refused, and in one case the refusal was only momentary—the inspector merely had to wait. Thus, the evidence indicates that consent will serve defendants' interest in routine inspections in the majority of cases. *Cf. Marshall v. Barlow's, Inc.,* 436 U.S. 307, 316 & n.11, 98 S.Ct. 1816, 1822 & n.11, 56 L.Ed.2d 305 (1978) (absent evidence of widespread refusals, availability of consent entries under OSHA minimizes burden imposed by warrant requirement).

Second, the nature of the incidents described in defendants' exhibits belies their contention that violations cannot be detected without entering the home.[15] In three incidents, inspections were initiated as a result of complaints from third parties. In two incidents, the violation (lack of supervision) could be observed from outside the home, because children could be seen playing outdoors unattended. In two cases, the inspections were being conducted pursuant to application for renewal of the family day care license; as explained below, renewal of a license can justify issuance of an administrative inspection warrant, in the unlikely event that the licensee's consent cannot be obtained. In one instance, the inspector was able to observe the violation (overcapacity) when the licensee's daughter opened the door in response to her knock. Subsequently, the licensee consented to the entry; if she had not, however, the inspector's initial observation could have been used to support the issuance of a warrant. Finally, in two instances violations had already been observed on prior visits, presumably consent entries. If there is reason to suspect that a violation has not been corrected, of course a warrant will issue.

Thus, in only three of the incidents cited by defendants was there no information available before the inspection that would have justified a warrant. In none of these was consent to enter refused. Furthermore, two of the three concerned overcapacity, apparently the most common violation. Overcapacity can be detected, if necessary, from exterior observation, by counting the children as they are dropped off at the home.[16]

rather than correction of the violations, this implies a punitive purpose, and reinforces the argument that a warrant should be required under *Payton v. New York. See Salwasser Mfg. Co. v. Municipal Court,* 94 Cal.App.3d 223, 233, 156 Cal.Rptr. 292 (5th Dist. 1979).

15. This is another factor distinguishing family day care homes from the type of facility at issue in the *Firstenberg* case. *See People v. Firstenberg,* 92 Cal.App.3d at 580–81, 155 Cal. Rptr. 80.

16. Defendants argue that they do not have the resources to conduct such surveillance. However, neither administrative convenience nor budgetary constraints justify governmental deprivation of fundamental constitutional rights. *See generally Estelle v. Williams,* 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976) (administrative convenience; right not to stand trial in prison garb); *Vlandis v. Kline,* 412 U.S. 441, 451, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973) (same; right to due process); *Watson v. City of Memphis,* 373 U.S. 526, 537, 83 S.Ct. 1314, 1320, 10 L.Ed.2d 529 (1963) (funds; right to desegregated public parks); *Spain v. Procunier,* 600 F.2d 189, 200 (9th Cir. 1979) (funds or inconvenience; right to be free from cruel and unusual punishment); *Bracco v. Lackner,* 462 F.Supp. 436, 449 (N.D.Cal.1978) (funds; right to due process in closing of convalescent home and transfer of patients).

Finally, as distinct from the 24-hour care situation in *Firstenberg*, children in family day care homes are seen daily by their own parents or guardians, who are presumably at least as interested in their welfare as is the state. Even if the children are too young to talk, their parents will still be in a position at drop-off and pick-up time to observe the conditions in the home and the well-being of their own and other children. If parents suspect neglect, abuse, overcrowding, or unsafe conditions, the statutes and regulations expressly provide that they may complain to the licensing authority, that the day care provider cannot retaliate against them for exercising this right, and that the provider must inform parents of the complaint procedure. Cal. Health & Safety Code §§ 1538–39; 22 Cal.Admin. Code § 86037(a)(3). Bona fide complaints from parents would, of course, be an appropriate basis for issuance of a warrant.

█ In sum, defendants' own evidence suggests that there are only a small number of cases in which the family day care provider will not consent to entry, and that violations of the health and safety regulations governing family day care homes can often be detected initially without entering the home, thus making a warrant available. Thus, the state's need for the power to perform warrantless inspections applies only in those few cases where the parents do not complain, consent is refused, and investigation reveals no basis for a warrant. The evidence produced by the state does not indicate that any such instances exist. Of the four occasions specified in the evidence in which consent to enter was refused, in two instances there apparently would have been a basis to seek a warrant (Exhibits G, K to Defendants' Cross-Motion). In the other two, there is no allegation that a warrant could not have been obtained (Stipulation of Facts, ¶ 12). Thus, the state has made no factual showing that imposition of a warrant requirement would impose an undue burden or impair the effective en-

forcement of the family day care regulations. Cf. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 316–17, 98 S.Ct. 1816, 1822–23, 56 L.Ed.2d 305 (1978) (no evidence of widespread pattern of refusal to consent to OSHA searches; no convincing showing that serious burden would be imposed by warrant requirement).

█ To subordinate the fundamental Fourth Amendment rights of many thousands of family day care providers [17] and the other residents of their homes to the state's asserted need in a small, speculative category of cases would be inconsistent with the priorities and values established by the Constitution. Thus, this court holds that warrantless searches of family day care homes are unreasonable and do not comport with the Fourth Amendment. The provisions of California law purporting to authorize such searches are unconstitutional as applied to family day care homes.

### III

Standards Governing Issuance of Warrants

As previously noted, *Marshall v. Barlow's, Inc.* allowed for a different standard of probable cause to be used in administrative inspection cases than is required for criminal search warrants. However, this holding was premised on the generally civil nature of federal OSHA proceedings and penalties. Under California OSHA law, where the penalties are frequently criminal in nature, administrative warrants are used, but the administrative cause standard is replaced by the probable cause standard used in criminal cases. *Salwasser Mfg. Co. v. Municipal Court*, 94 Cal.App.3d 223, 231–33, 156 Cal.Rptr. 292 (5th Dist. 1979). Thus, the requirement of a warrant to inspect a family day care home raises the further question of what cause must be shown for the warrant to issue.

█ The criminal penalties applicable to operators of family day care homes have already been described. Briefly, Cal.

---

17. The parties have stipulated that in August, 1979 there were 18,390 licensed family day care homes in California.

Health & Safety Code § 1540 provides that any willfull or repeated violation of the regulatory standards is a misdemeanor.[18] There is thus a broad potential for criminal liability almost any time an inspector enters a family day care home, as almost any violation detected could potentially be found to be willfull, and thus a misdemeanor. This court agrees with the *Salwasser* court that if the state chooses to subject family day care providers to criminal sanctions, it must also afford them the full panoply of protections associated with the criminal justice system. Thus, for any inspection whose purpose is to determine whether or not a violation of the statutes or regulations governing family day care homes is occurring, the administrative inspection warrant to enter the home must be based upon probable cause, the provisions of Cal.Civ.Proc. Code § 1822.52 to the contrary notwithstanding.

However, certain of the inspections performed by defendants are not aimed at detecting violations, but are part of an administrative enforcement scheme like that in *Camara v. Municipal Court*, 387 U.S. 523, 534–39, 87 S.Ct. 1727, 1733–36, 18 L.Ed.2d 930 (1967). These include prelicensing inspections (where the applicant is not suspected of prior unlicensed operation), and the biannual inspections mandated by statute, which presumably would normally coincide with the application to renew the license. *See* Cal. Health & Safety Code §§ 1528(a), 1529. Warrants for inspections of this nature, if conducted in good faith, need only meet the requirements of Cal.Civ. Proc. Code § 1822.52.

CONCLUSION

" 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter— all his force dares not cross the threshold of the ruined tenement.' "

*Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (quoting remarks attributed to William Pitt, Earl of Chatham, in 1763). In this case, the King is the State of California, his force is a social worker, and the man in his cottage is the woman (in most instances) in her family day care home. But the principle is no different. Under the Fourth Amendment to our Constitution, government representatives cannot enter a private home uninvited without prior judicial authority in the form of a warrant. Nothing in the nature, history, or operation of California family day care homes warrants an exception to this rule, one of the most cherished values of our society.

---

18. *Operating an unlicensed or unregistered* home is also a misdemeanor. Cal. Health & Safety Code §§ 1508, 1528.5, 1540; *see* 22 Cal. Admin. Code § 86005(e). Plaintiffs are not themselves operators of unlicensed homes. Thus, their standing to question the validity of the statute as applied to unlicensed homes is unclear. *See generally Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Frissell v. Rizzo*, 597 F.2d 840, 844, 848 (3d Cir. 1979); *Wiren v. Eide*, 542 F.2d 757, 762 & n.7 (9th Cir. 1976). For that reason, this court does not reach the issue whether warrantless searches of unlicensed homes are unconstitutional. However, the state maintains that the statute authorizes such searches. *See* note 5 *supra* and accompanying text. In other words, casual, innocent babysitting arrangements among friends may be transformed into grounds for warrantless searches depending on the interpretation given them by the inspector. *See* note 2 *supra* (discussing breadth of regulatory definition of family day care). Such a suggestion casts even greater doubt on the reasonableness of these provisions in light of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).